WIGGINS, Justice.
An employee injured her back at work. Her employer acknowledged its liability for the injury and authorized care. The employer paid for the cost of the care the employee received to treat the back injury through September 30, 2009. The employee brought a workers’ compensation claim seeking reimbursement of medical expenses she incurred for additional back treatment between May 2010 and April 2011 and workers’ compensation benefits for the same period. The employer argued it did not authorize the medical expenses the employee incurred between May 2010 and April 2011. The employer. also maintained the expenses did not have a causal connection to her compensable workplace injury. The workers’ compensation commissioner concluded the treatment the employee received between May 2010 and April 2011 was not causally related to her workplace injury. However, the commissioner held the employer was liable for the claimed medical expenses because the employer failed to notify the employee *764 it was no longer authorizing care as required by Iowa Code section 85.27(4) (2009). Both parties sought judicial review.
The district court reversed the final agency decision in part, concluding the agency misinterpreted section 85.27(4). Both parties appealed, and we transferred the case to the court of appeals. The court of appeals reversed the district court in part, concluding the district court erroneously interpreted section 85.27(4).
Both parties, sought further review, which we granted. On further review, we will let the court of appeals decision stand as the final decision of this court to the extent it affirmed the district court decision affirming in part the final agency decision. However, we find the commissioner erroneously interpreted Iowa Code section 85.27(4). Accordingly, we affirm in part and vacate in part the decision of the court of appeals, affirm in part and reverse in part the district court judgment, and remand the case to the district court with instructions to remand the case to the commissioner for further proceedings .consistent with this opinion.
I. Background Facts and Proceedings.
On August 1, 2009, Deanna Ramirez-Trujillo slipped on an egg on the floor at her workplace in Clarion, Iowa. Although Ramirez-Trujillo managed to catch herself and did not fall to,the,floor) she injured her back. . Her employer, Quality Egg, L.L.C., Wright County Egg Division, completed an incident report acknowledging her workplace injury.
Quality Egg authorized Wright Medical Center to evaluate and treat Ramirez-Trujillo. Physician assistants at Wright Medical Center treated Ramirez-Trujillo for acute low back strain and severe muscle spasms on August 3, 7, 13, 21, and 31. At each visit, Ramirez-Trujillo signed the bottom of the authorization form to release her medical records to Quality Egg and its insurer, Selective Insurance Company of America. After her August 3 visit, her health care provider released her to return to work with restrictions.
Throughout the months of August and September, Ramirez-Trujillo received prescription medications, transcutaneous electrical nerve stimulation treatment, and physical therapy. Though she received an authorization form from Quality Egg each time she saw a physician assistant at Wright Medical Center, she did not receive any authorization forms for her physical therapy appointments. On September 30, Ramirez-Trujillo had a follow-up appointment with a physician assistant at Wright Medical Center. Quality Egg once again authorized Wright Medical Center to evaluate and treat Ramirez-Trujillo, and she once again signed the authorization form to release her medical records to Quality Egg and its insurer. The physician assistant released Ramirez-Trujillo to full duty without any work restrictions. The physician assistant’s notes indicated Ramirez-Trujillo’s back strain was resolving and no follow-up care was required. The notes also indicated Ramirez-Trujillo could return to-the clinic should further problems arise.
On December 26, Ramirez-Trujillo sought treatment for low back pain radiating up to her head and down to her toes at the emergency room at Wright Medical Center. She received an injection, prescriptions for several medications, and a temporary work release. The physician assistant’s notes indicated Ramirez-Trujillo said the pain had begun after she shoveled snow the previous day. She returned to work on December 29.
*765 On May 1, 2010, Ramirez-Trujillo again sought treatment for low back pain at the emergency room at Wright Medical Center. She received two injections, prescriptions for several medications, and a temporary work release. The treating physician advised Ramirez-Trujillo to seek follow-up care in one week. The physician’s notes acknowledged Ramirez-Trujillo’s historical problems with back pain and indicated there had been no clear triggers for her pain that day.
Over the next several weeks, Ramirez-Trujillo received follow-up care from a physician assistant and a doctor at Wright Medical Center. She began physical therapy and continued to take prescription medication. On May 17, Ramirez-Trujillo reported her pain was gone and she felt ready to return to work. The doctor released her to full duty without work restrictions. During a follow-up appointment on June 9, however, Ramirez-Trujillo reported she was still experiencing intermittent low back pain and muscle spasms.
On June 13, Ramirez-Trujillo again sought treatment at the emergency room at Wright Medical Center. An x-ray of her lumbar spine showed disc space narrowing at L5-S1. Her treating physician prescribed medication and instructed her to seek follow-up care. The physician’s notes indicated Ramirez-Trujillo said she had been experiencing intermittent back pain since she injured her back when she slipped on an egg at work.
On June 14, Ramirez-Trujillo sought follow-up care at Wright Medical Center. The doctor who treated Ramirez-Trujillo ordered an MRI, which revealed a prominent disc extrusion with mild to moderate spinal stenosis at L5-S1. The doctor’s notes indicated Ramirez-Trujillo said she had previously injured her back at work but characterized her recent pain as a separate episode. The notes also indicated Ramirez-Trujillo expressly stated “this is not workman’s comp.” The doctor referred Ramirez-Trujillo to orthopedic surgeon Mark Palit.
On June 28, Dr. Palit saw Ramirez-Trujillo at Wright Medical Center and administered a steroid injection. ' On July 19, Dr. Palit saw Ramirez-Trujillo at a followup appointment. Because Ramirez-Trujillo reported she continued to experience severe pain, Dr. Palit offered to perform decompression surgery. Dr. Palit’s notes indicated Ramirez-Trujillo told him the August 2009 slip injury had résolved with conservative care by October 2009 and said she did well until May 2010 when she was going up some stairs and her back locked up.
On’ August 4, Dr. Palit performed decompression surgery on' Ramirez-Trujillo. Dr. Palit discharged her from Wright Medical Center the following day. Ten days later, she’ sought treatment at the emergency room at Wright Medical Center due to drainage occurring at the surgical site and received an antibiotic to treat cellulitis. Ramirez-Trujillo attended follow-up appointments with Dr. Palit at Wright Medical Center in August, September, and October. Ramirez-Trujillo sought further treatment in November and December for increased pain in her back radiating to her right hip and foot. Dr. Palit prescribed medication and physical therapy. Between the date of the surgery and the end of the year, she received three temporary work releases from Dr. Palit. However, each work release covered only a few days.
At a follow-up appointment on January 3, 2011, Dr. Palit imposed work restrictions on Ramirez-Trujillo and ordered another MRI of her lumbar spine due to her continuing pain. The MRI revealed a recurrent disk protrusion at L5-S1. Ra *766 mirez-Trujillo attended several additional follow-up appointments during January and February, during which she received prescriptions and a steroid injection. On March 23, Dr. Palit performed a revision of the decompression surgery. He discharged Ramirez-Trujillo from Wright Medical Center the following day.
This appeal follows from a notice and petition Ramirez-Trujillo filed ■ with the workers’ compensation commissioner against her employer and its insurer[1] on October 13, 2010. She sought workers’ compensation benefits, penalty benefits, and medical expenses she incurred from May 2010 through April 2011.[2] Quality Egg stipulated Ramirez-Trujillo sustained an injury in the course of her employment on August 1, 2009, that caused her a temporary disability. Additionally, Quality Egg stipulated the treatment Ramirez-Trujillo received was reasonable and necessary and the fees, charged by her care providers were fair and reasonable. Quality Egg argued it did not authorize the medical expenses Ramirez-Trujillo incurred between May 2010 and April 2011. Quality Egg also argued those medical expenses did not have a causal connection to her compensable workplace injury. However, Quality Egg did not dispute the medical expenses Ramirez-Trujillo incurred were at least causally connected to the medical condition upon which her claim of injury was based.
The evidence presented at the arbitration hearing established medical providers treated Ramirez-Trujillo for low back strains and spasms on several occasions dating back to the time when she was eleven years old, but that her prior back issues had. resolved before her August 2009 work injury.[3]
Ramirez-Trujillo submitted a written evaluation and report prepared by Dr. Robin E'pp, a certified independent medical examiner. Based on a physical examination of Ramirez-Trujillo and a review of her medical records, Dr. Epp concluded Ramirez-Trujillo’s back condition and the treatment she received after September 30,2009, were directly and causally related to her work injury and her subsequent work activities. Ramirez-Trujillo’s testimony and other testimony by lay witnesses supported Dr. Epp’s opinion.
Quality Egg submitted a written medical opinion prepared by Dr. Donna Bahls. Based on her review of a portion of Ramirez-Trujillo’s medical records, Dr. Bahls concluded neither the work injury nor Ramirez-Trujillo’s subsequent work activities contributed to the periods of disability she experienced after the December 2009 shoveling incident. Dr. Bahls further concluded neither the work injury nor Ramirez-Trujillo’s subsequent work activities prior to the shoveling incident caused her disk to herniate. Rather, Dr. Bahls concluded the shoveling incident or other events Ramirez-Trujillo mentioned to her doctors caused the periods of disability she experienced and the medical care she received on and after December 26, 2009.
Quality Egg also submitted an exhibit on which Dr. Palit indicated his agreement with the following statement:
*767 Dr. Palit do you agree that it is your opinion that you cannot state with reasonable medical certainty that the central and right paracentral prominent disc extrusion at L5-S1 with mild to moderate stenosis shown on the MRI, the symptoms reported by Ms. Ramirez-Trujillo in May-July 2010, the herniated nucleus pulposus at L5-S1 that you diagnosed, the surgery you performed on August 4, 2010 described as an L5-S1 bilateral hemilaminotomy, for-aminotomy. and discectomy and the revision of the L5-S1 surgery that you performed were caused by or related to the injury of August 1,2009?
Two employees testified and submitted written statements on behalf of Quality Egg, including one employee who was Ramirez-Trujillo’s supervisor and another who was her coworker. Both employees testified to hearing Ramirez-Trujillo- state she had slipped or fallen on some stairs at home.[4] In addition, Ramirezr-Trujillo’s supervisor testified’ regarding various conversations he- claimed to have had with her in which she admitted the condition she was seeking treatment for at the time was not work-related.
The deputy commissioner issued an arbitration decision extensively summarizing the above facts and testimony. The arbitration decision expressly addressed the credibility of the witnesses, including both the lay -witnesses who testified and the expert witnesses whose reports the parties submitted as exhibits. The deputy commissioner also máde numerous legal conclusions, one of which is particularly relevant to this appeal. Namely, the deputy commissioner concluded Ramirez-Trujillo’s condition after September 30, 2009, was not the result’ of her August 2009 work injury. The deputy commissioner thus denied Ramirez-Trujillo’s claims for workers’ compensation benefits and medical expenses incurred after September 30, 2009.
Ramirez-Trujillo appealed to the workers’ compensation commissioner. The appeal decision affirmed and adopted the majority of the arbitration decision, noting the hearing deputy’s findings of fact and conclusions of law could be adequately separated for review' on appeal' and giving deference to the hearing deputy’s credibility assessments. The appeal decision thus affirmed the hearing deputy’s conclusion that the medical expenses Ramirez-Trujillo incurred from May 2010 through April 2011 were not causally related to the August 2009 work injury. However, the appeal decision nonetheless awarded Ramirez-Trujillo the medical expenses she incurred from May 2010 through April 2011 and associated transportation expenses because she incurred them while seeking care from providers Quality Egg authorized and because Quality Egg conceded it failed to notify her - it was not authorizing .further treatment. The commissioner interpreted Iowa Code section 85.27(4) to require an employer to cover the cost of authorized care unless the employer satisfies its duty to monitor the care it authorizes and its duty to notify the employee when further care is no longer authorized, even if the care provided is ultimately found to be unrelated to the work injury.
Quality Egg sought judicial review of the portion of the final agency decision ordering it to reimburse and hold Ramirez-Trujillo harmless for medical expenses she incurred after September 30, *768 2009. Ramirez-Trujillo asserted the agency erred in failing to comply with' Iowa Code section 17A.16(1) and in applying legal standards on the issue of causation.
The district court affirmed the final agency decision in part, and reversed it in part. The court concluded the agency did not violate section 17A.16(1) and did not err in finding Ramirez-Trujillo’s condition after September 30, 2009, was not causally related to her work injury,, However, the court also, concluded the agency misinterpreted section 85.27(4). The court found Quality Egg reasonably believed Ramirez-Trujillo had recovered from the work injury and would not seek further care for that injury after September 30, 2009. It also found Quality Egg did not receive notice Ramirez-Trujillo was seeking further care after that date for conditions related to the work injury. The court therefore concluded Quality Egg was not liable for the expenses Ramirez-Trujillo incurred after September 30.
Ramirez-Trujillo appealed the district court judgment. We transferred the case to the court of appeals. The court of appeals affirmed the portion of the district court judgment affirming a portion of the final agency decision. However, the court of appeals concluded the district court erroneously interpreted-, section 85.27(4). Accordingly, the court of appeals reversed the. portion of the district court judgment reversing the agency’s determination that Quality Egg was liable to Ramirez-Trujillo for the expenses she incurred from May 2010 through April 2011.
Both parties sought further review.
II. Scope of Review.
When this court grants an application for further review, we retain discretion to review all the issues raised on appeal or in the application for. further review, or only a portion thereof.. Gits Mfg. Co. v. Frank, 855 N.W.2d 195, 197 (Iowa 2014). In exercising this discretion, we choose to review only the issue concerning the proper interpretation of Iowa Code section 85.27(4). Accordingly, the court of appeals decision will stand as the final decision to the extent it affirmed the district court judgment affirming portions of the final decision of the workers’ compensation commissioner.
The standards set forth in Iowa Code chapter 17A govern judicial review of final decisions by the workers’ compensation commissioner. Westling v. Hormel Foods Corp., 810 N.W.2d 247, 251 (Iowa 2012); see Iowa Code § 17A.1(2). When the legislature has clearly vested authority to interpret statutory language in an agency, we will defer to an agency interpretation of that language. Renda v. Iowa Civil Rights Comm’n, 784 N.W.2d 8, 10-15 (Iowa 2010). Thus, when the legislature has clearly vested the agency with interpretive authority, we will reverse an agency decision only when its interpretation of statutory language is “irrational, illogical, or wholly unjustifiable.” Coffey v. Mid Seven Transp. Co., 831 N.W.2d 81, 88 (Iowa 2013) (quoting NextEra Energy Res. LLC v. Iowa Utils. Bd., 815 N.W.2d 30, 37 (Iowa 2012)); see Iowa Code § 17A.19(10)(Z), (ll)(c)., If the legislature did not elearly vest the agency with interpretive authority, however, we review questions of statutory interpretation for correction of errors at law. Westling,, 810 N.W.2d at 251; see Iowa Code § 17A.19(10)(c), (H)(6). .
In determining whether the legislature has clearly vested interpretive authority in the workers’ compensation commissioner, we consider the nature of the statutory language the agency has construed. See Burton v. Hilltop Care Ctr., 813 N.W.2d 250, 256-57 (Iowa 2012). *769 When the legislature' has hot exphcitly granted interpretive authority, we must examine “the phrases or statutory provisions to be interpreted, their context, the purpose of the statute, and other practical considerations to determine whether the legislature intended to give interpretive authority to an agency.” Clay County v. Pub. Emp’t Relations Bd., 784 N.W.2d 1, 4 (Iowa 2010) (quoting Renda, 784 N.W.2d at 11-12).
We are more likely to conclude the legislature clearly vested interpretive power in an agency when the agency necessarily must interpret the statutory language at issue in carrying out its duties and no relevant statutory definition applies. Renda, 784 N.W.2d at 12, 14. In addition, when the statutory language at issue is a substantive term within the special expertise of an agency, we generally conclude the legislature has vested the agency with authority to interpret it. See NextEra Energy, 815 N.W.2d at 37. Ultimately, however, we will defer to an agency interpretation only when we are firmly convinced “the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law.” Renda, 784 N.W.2d at 14 (quoting Arthur E. Bonfield, Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government 63 (1998)).
We have never before interpreted the statutory language at issue in this appeal, though we have previously interpreted statutory language in the same subsection of the Code. See, e.g., Bell Bros. Heating & Air Conditioning v. Gwinn, 779 N.W.2d. 193, 202-08 (Iowa 2010). Therefore, we begin our analysis by determining whether the legislature clearly vested the workers’ compensation commissioner with authority to interpret the statutory language at issue. See, e.g., Gartner v. Iowa Dep’t of Pub. Health, 830 N.W.2d 335, 343 (Iowa 2013).
Iowa Code section 85.27(4) affords an employer who does not contest the compensability of a workplace injury a qualified statutory right to control the medical care provided to an injured employee. R.R. Donnelly & Sons v. Barnett, 670 N.W.2d 190, 195, 197 (Iowa 2003). It provides in relevant part,
For purposes of this section, the employer is obliged to furnish reasonable services and supplies to treat' an injured employee, and has the right to choose the care. If the employer chooses the care, tEe employer shall hold the em-'ployeé harmless for the cost of care until the employért notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization.
Iowa Code §, 85.27(4) (emphasis added).
The legislature has not expressly vested the workers’ compensation commissioner with authority to interpret the workers’ compensation statutes .in chapter 85. The fact , the legislature has granted the commissioner authority to adopt and enforce ipiles necessary to the implementation of chapter 85 does not itself indicate the legislature has clearly vested the commissioner with authority to interpret it. See Roberts Dairy v. Billick, 861 N.W.2d 814, 817 (Iowa 2015). '
Section 85.27(4) constitutes a bread-and-butter provision of the workers’ compensation statute regularly administered by the commissioner. The fact that an agency necessarily must interpret statutory' language in carrying outfits duties provides a potential basis for concluding the legislature clearly vested interpretive authority therein. Renda, 784 N.W.2d at *770 12, 14. However, we have previously declined to conclude the legislature clearly vested interpretive authority in the workers’ compensation commissioner on this basis standing alone. See Iowa Ins. Inst. v. Core Grp. of Iowa Ass’n for Justice, 867 N.W.2d 58, 65, 77 (Iowa 2015). In fact, we have declined to defer to the commissioner’s interpretations of various provisions of chapter 85 in recent years. Id. at 65. Moreover, section 85.27(4) contains no substantive terms uniquely within the interpretive expertise of the workers’ compensation commissioner.
On balance, we are not firmly convinced the legislature intended to delegate authority to interpret section 85.27(4) to the workers’ compensation commissioner. See Renda, 784 N.W.2d at 14. Accordingly, we will not defer to, the commissioner’s interpretation of section 85.27(4) and will substitute our own judgment for that of the commissioner should we conclude the commissioner’s interpretation rests on an error at law. See Iowa Code § 17A.19(11)(b); Renda, 784 N.W.2d at 14-15.
III. Analysis and Discussion.
When interpreting the statutory provisions contained in chapter 85 of the Iowa Code, our goal is to determine and effectuate the legislature’s intent. United Fire & Cas. Co. v. St. Paul Fire & Marine Ins. Co., 677 N.W.2d 755, 759 (Iowa 2004). To determine legislative intent, we look to the language chosen by the legislature and not what the legislature might .have said, Schadendorf v. Snap-On Tools Corp., 757 N.W.2d 330, 337 (Iowa 2008). Absent a statutory definition, we consider statutory, terms in the context in which they appear and give each its ordinary and common meaning. Rojas v. Pine Ridge Farms, L.L.C., 779 N.W.2d 223, 235 (Iowa 2010). When reasonable persons could disagree as to what a statute means, the meaning of the statute is ambiguous. Holstein Elec. v. Breyfogle, 756 N.W.2d 812, 815 (Iowa 2008). Ambiguity may arise, due to uncertainty concerning the meaning of particular words or upon examination of all the statute’s provisions together in context. Id.
When the meaning of the statute is ambiguous, we may consider rules of statutory construction in our interpretive analysis. Id. We assess the statute in its entirety rather than isolated words or phrases to ensure our interpretation is harmonious with the statute as a whole. Schadendorf, 757 N.W.2d at 337. Because we presume the legislature included every part of the statute for a purpose, we avoid construing a statutory provision in a manner that would make any portion thereof redundant or irrelevant. Rojas, 779 N.W.2d at 231; see Iowa Code § 4.4(2). We also avoid construing statutory provisions in a manner that will lead to absurd results. Iowa Ins. Inst., 867 N.W.2d at 75; see Iowa Code §§ 4.4(3), .6(5).
The primary purpose of the workers’ compensation statute contained in chapter 85 is to benefit the worker. Griffin Pipe Prods. Co. v. Guarino, 663 N.W.2d 862, 865 (Iowa 2003). To this end, chapter 85 encourages employers to compensate employees who receive workplace injuries promptly and provides a forum for efficient resolution of workplace-injury claims with minimal litigation. See Des Moines Area Reg’l Transit Auth. v. Young, 867 N.W.2d 839, 847 (Iowa 2015); Bell Bros., 779 N.W.2d at 202; Flint v. City of Eldon, 191 Iowa 845, 847, 183 N.W. 344, 345 (1921).
In enacting the right-to-choose provision in section 85.27(4), our legislature sought to balance the interests of injured employees against the competing *771 interests of their employers. Bell Bros., 779 N.W.2d at 202, 207; IBP, Inc. v. Harker, 633 N.W.2d 322, 326-27 (Iowa 2001). The statute imposes an affirmative duty on employers who concede the -com-pensability of workplace injuries to furnish care to injured employees. Bell Bros., 779 N.W.2d at 202. However, it also empowers employers who fulfill this obligation “to substitute their judgment for that of their injured employees on the important question of which medical professionals are best suited to diagnose and treat work-related injuries.” Baker v. Bridgestone, 872 N.W.2d 672, 678 (Iowa 2015); see R.R. Donnelly, 670 N.W.2d at 195. In other words, the statute grants employers a limited right to choose who provides the care to an injured employee — a right that is modified by several- statutory protections afforded to employees. Bell Bros., 779 N.W.2d at 202-04.
Because our legislature sought to balance the interests of employers and the interests of injured employees in enacting section 85.27(4), the right of employers to control care is not absolute. See Baker, 872 N.W.2d at 678 n. 3. Rather, an employer’s right to control care is a limited or qualified right. R.R. Donnelly, 670 N.W.2d at 195, 197; W. Side Transp. v. Cordell, 601 N.W.2d 691, 693 (Iowa 1999); see Bell Bros., 779 N.W.2d at 203-04. Thus, although the statute promotes the prompt resolution of claims without litigation, it also anticipates that workplace injuries can lead to disputes between employers and injured employees. R.R. Donnelly, 670 N.W.2d at 195; see Bell Bros., 779 N.W.2d at 204.
At issue in this appeal is the second sentence of section 85.27(4), which provides,
If the- employer chooses the care, the employer shall hold the employee harmless for the cost of care until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for the change in authorization.
We must determine how the legislature intended this sentence to modify the right of employers to choose care for injured employees.
The first half of the sentence provides an employer who chooses the care an injured employee receives “shall hold the employee harmless for the cost of care.” When the term “shall” appears in a statute, it generally connotes the imposition of a mandatory duty. In re Marriage of Thatcher, 864 N.W.2d 533, 539 (Iowa 2015); In re Det. of Fowler, 784 N.W.2d 184, 187 (Iowa 2010). Moreover, rules of statutory construction set forth in the Iowa Code specify that in statutes enacted after July 1,1971, the word “shall” imposes a duty unless otherwise specified by the legislature.[5] Iowa Code § 4.1(30)(a). Absent'any ambiguity in a statutory definition, we are obligated to apply the statutory definition the legislature adopted to explain a statutory term. Sherwin-Williams Co. v. Iowa Dep’t of Revenue, 789 N.W.2d 417, 425 (Iowa 2010). Accordingly, we interpret the plain language of section 85.27(4) to obligate employers to hold employees harmless for authorized medical expenses.
The remainder of the sentence clarifies the scope of this obligation. Namely, it *772 provides an employer who chooses care for an injured employee has a corresponding duty to “hold the employee harmless for the cost of the care until the employer notifies the employee that the employer is no longer authorizing all or any part of the care and the reason for' the change in authorization.” Iowa Code § 85.27(4). The ordinary meaning of the word “until” is “up to the time that.” Webster’s Third New International Dictionary 2513 (un-abr. ed.2002). Thus, section 85.27(4) plainly indicates an employer who authorizes care is responsible for the cost of the care up to the time- when the employer notifies the employee it is no longer authorizing care.
Because, section 85.27(4) obligates an employer to notify an employee when it. is no longer authorizing care, it also obligates an employer to determine when it no longer wishes to authorize care. With the power to choose the care comes the responsibility to monitor the care for the purpose of determining when further care will no longer be authorized.[6] An employer can easily reconsider whether it wishes to authorize further .care when an authorized medical provider indicates an employee requires no further care for a workplace injury or when the employer authorizes a new provider to take over an employee’s care. Therefore, the employer’s statutory burden to monitor an injured employee’s care is not an onerous one.
Section 85.27(4) balances this minimal burden with a significant corresponding benefit-r-a means of extinguishing the employer’s ongoing obligation to pay for medical expenses following its acknowledgment of compensability and exercise of the right to choose’ care. Interpreting section 85.27(4) to reward- an employer who monitors the care it authorizes and communicates to the employee when it is no longer authorizing care is consistent with our pri- or recognition that the legislature .sought to balance the interests of employees and employers in enacting section 85.27(4). Bell Bros., 779 N.W.2d at 202, 207; IBP, 633 N.W.2d at 326-27.
On the one' hand, section 85.27(4) protects the right of employers to choose care in various ways. Once an employer’s right to control medical care attaches under section 85.27(4), “it remains with the employer under the statute until' the employer denies the injury is work-related, withdraws authorization of the care, or until the commissioner orders alternative care.” Bell Bros., 779 N.W.2d at 207. An employer’s denial of compens-ability leads to the loss of its right to choose care only when it denies the claimed injury arose in the' course and scope of employment. Id. Thus, when an employer acknowledges the injury an employee suffered, is compensable, the employer does not forfeit its right to choose eare just because it disagrees with the employee as to the nature or extent of the disability caused by the workplace injury. Id. Even after a dispute arises concerning the compensability.of a portion of the injured employee’s ongoing care, the employer is entitled to control ongoing care to treat injuries with respect to which it does not contest compensability. See id. *773 After an employer relieves an employee of the burden of proving causation by acknowledging compensability and authorizing care, the employer may reinstate that burden to the extent it believes compensa-bility is in doubt. See id. at 207-08.
On the other hand, section 85.27(4) safeguards the ability of employees to make decisions regarding the course of the care they receive. Nothing in the statute prevents an employee from obtaining unauthorized care. See id. at 205; see also R.R. Donnelly, 670 N.W.2d at 197. In addition, nothing in the statute prevents an employee from obtaining reimbursement for expenses incurred in seeking unauthorized care Upon an adjudication of compensability.[7] Bell Bros., 779 N.W.2d at 206. Rattier, an employee generally may recover medical 'expenses incurred'in seeking unauthorized care upon proving by a preponderance of the evidence the care was reasonable and beneficial under the totality' of the circumstances. Id. Moreover, when the employee believes the employer has not offered care promptly or has offered care that is unduly inconvenient or- not reasonably suited to treat the injury sustained, the employee may apply with the workers’ compensation commissioner for approval-to seek alternate care.[8] R.R. Donnelly, 670 N.W.2d at 196; W. Side Transp., 601 N.W.2d at 693. Thus, the commissioner retains authority to order the employer to pay for care chosen by the employee. W. Side Transp., 601 N.W.2d at 693. Additionally, the statute instructs the commissioner to issue decisions on applications, for alternate care within ten to fourteen days of their receipt. Iowa Code § 85.27(4).
As the foregoing overview .makes clear, section 85.27(4) does not require employees to prove medical causation in order to establish employer liability for authorized medical expenses.[9] Rather, under section 85.27(4), an employer obtains the right to choose care only by conceding the com-pensability of the claimed injury. Bell Bros., 779 N.W.2d at 207. That means before the employer chooses care and authorizes it, the employer must concede the claimed' injury arose in the course and scope of employment. See Lakeside Casi *774 no v. Blue, 743 N.W.2d 169, 173 (Iowa 2007) (explaining' that a compensable injury requires a connection between the injury and employment, which “is established by showing the injury arose out of and in the course of the worker’s employment”). To interpret section 85.27(4) to require an employee seeking payment of authorized medical expenses to prove compensability after the employer has conceded compensi-bility would upset the delicate balance of employer and employee protections the legislature sought to achieve in enacting section 85.27(4). To do so would undermine the concept of authorized care and subject employees to retroactive liability for care they did not choose.[10] See Iowa Ins. Inst., 867 N.W.2d at 75 (“We have long recognized that statutes should not be interpreted in a manner that leads to absurd results.”); see also Iowa Code § 4.4(3) (stating it is presumed the legislature intends statutes to effect just and reasonable results); id. § 4.6(5) (indicating a court may consider consequences in construing an ambiguous statute).
Conversely, it is apparent from the language of the statute the employer generally must choose the care as a precondition to being responsible for its costs. The operative phrase is “chooses the care,” not “has chosen the same provider at some time in the past.” Furthermore, the second sentence of subsection (4) must be read together with the first sentence, which states, “For purposes of this section, the employer ... has the right to choose the care.” Iowa Code § 85.27(4). Thus, the choice of care referenced in the second sentence of section 85.27(4) is a choice for purposes of the entire section — namely, section 85.27. And the overall purpose of the section is the treatment of “injuries compensable under [chapter 85].” Id. § 85.27(1). This further highlights that employer liability in section 85.27(4) is premised upon an employer’s choice of care for a particular injury. Under the plain statutory language of section 85.27(4), it is not enough that the employee happened to show up for treatment at a health care provider to which the employer had referred the employee in the past.
*775 Similarly, interpreting section 85.27(4) to impose liability on employers for any medical care an employee receives from an authorized medical provider would lead to absurd results. As we recently stated:
We have long recognized that statutes should not be interpreted in a manner that leads to absurd results. In order to apply this well-established rule, we sometimes consider fact patterns othéí than the one before the court to determine if a particular statutory interpretation would have untoward consequences. That is part of the judicial function — to consider alternative statutory interpretations and see where those alternatives logically lead.
Iowa Ins. Inst., 867 N.W.2d at 75-76 (citations omitted); see Iowa Code §§ 4.4(3), .6(5). Undoubtedly, the legislature did not intend an employer who acknowledged the compensability of a foot injury to be liable for expenses the employee incurred after getting the flu merely because the employee sought care at an authorized medical center.
Interpreting section 85.27(4) to require such a result would discourage employers from authorizing care for fear of incurring liability for conditions clearly unrelated to the workplace. For example, employers would be discouraged from authorizing care to a medical facility as opposed to an individual specialist in order to avoid liability for treatment the employee receives for unrelated conditions. It is unlikely the legislature intended that result, as employees retain the ability to exercise some degree of choice concerning who will treat their injuries when their employers authorize care from medical facilities rather than individual medical providers.
To illustrate, we note the provider at issue here is the Wright Medical Center located in Clarion, Iowa, the county seat of Wright County. The record does not indicate whether there are any other health care facilities or individual health care providers in Wright County, but clearly Wright Medical Center offers a wide array of services.’ From reviewing the medical records, we know it has an emergency room, a rehabilitation department, a family practice clinic, a specialty clinic, hospital beds, and facilities for surgeries and births. Undoubtedly, Quality Egg did not intend to bind itself to pay for any care Ramirez-Trujillo might receive at Wright Medical Center merely by authorizing her to seek care for her work injury at that facility.
Consequently, we conclude section 85.27(4) limits employer liability for authorized care to expenses incurred seeking care related to the medical condition or conditions for which the employee sought care in the aftermath of a workplace injury and upon which the employee’s claim for workers’ compensation benefits is based.[11]
Here, Quality Egg produced no evidence to suggest Ramirez-Trujillo did not incur the expenses she claimed seeking treatment for a back condition. In fact, Quality Egg conceded the medical expenses Ramirez-Trujillo incurred were at least causally connected to the .medical condition upon which her claim of injury was .based. *776 Accordingly, under the foregoing 'analysis, it-remains unclear whether Quality Egg was required to hold Ramirez-Trujillo harmless for care she received from May 2010 through April 2011. This is because Quality Egg produced no evidence to show it notified Ramirez-Trujillo that it was not authorizing further care.
In essence, Quality Egg disputes the care Ramirez-Trujillo received from May 2010 through April 2011 was authorized care, even, though it concedes it initially authorized her to seek care in the aftermath of her. workplace injury.[12] Thus, Quality Egg. argues a second limiting principle constrains employer liability for authorized, care under section 85.27(4). Specifically, Quality Egg suggests an employer need only notify the employee it is no longer authorizing care to relieve itself of liability when a reasonable employer would know the injured worker continues to seek care. Quality Egg thus argues the statute imposes an obligation on employees to make sure care authorizations are still in force before seeking further care.
We disagree. , Section 85.27(4) contains no language to suggest the legislature intended to obligate employees to make sure care authorizations remain in force before accepting care. Rather, the plain language of the statute obligates employers who authorize care for workplace injuries. Namely, an employer who authorizes care must pay for the cost of care until the employer notifies the employee it is no longer authorizing care. For purposes of determining whether an employer is liable for the cost of care an employee received after the employer authorized care for a workplace injury and failed to notify the employee it was not authorizing further care, it is irrelevant that the employer did not intend its authorization to remain in effect.[13]
Importantly, nothing in the language of section 85.27(4) suggests employees have a duty to investigate or a duty to inquire as to whether an authorization remains in effect before seeking care. To conclude the statute imposes such a duty on employees when the language of the statute clearly imposes a duty on employers would be inconsistent with our longstanding practice of construing chapter -85 liberally in favor of employees. See Griffin Pipe Prods., 663 N.W.2d at 865. The legislature did not intend employees to fear they might have to pay for. care they did not choose merely because they accepted it. Interpreting section 85.27(4) to impose a continuing obligation on employees to make sure the employer still authorizes care before accepting it would turn the statute on its head.
However, that does not mean the statute permits an employee to take advantage of an employer by seeking compensation after the fact for care the employee knew or should have known was not within the scope of the employer’s prior authorization. Section 85¿27(4) seeks to protect the employer who acknowledges an injury arose in the course and scope of employment and honors its obligation to “furnish reasonable services and supplies to treat an injured employee.” Iowa Code § 85.27(4). We simply do not believe sec *777 tion 85.27(4) requires an employer to notify an employee it is no longer authorizing care when the employee knows or reasonably should know the. care sought is for a condition, unrelated ..to • a compensable workplace injury or the prior authorization is no longer in effect. See Iowa Ins. Inst., 867 N.W.2d at 75-76; see also Iowa Code §§ 4.4(3), 6(5).
Accordingly, we conclude an employer may establish it is not liable for the cost of care an employee received from an authorized medical provider if it proves by a preponderance of the evidence the employee knew or reasonably should have known either that the care was unrelated to the medical condition or conditions upon which the employee’s claim for workers’ compensation benefits is based or that the employer no longer authorized the care the employee received at the time the employee received it. With respect to the latter alternative, the determinative question' is whether the totality of' the circumstances indicates the employee knew or should have known the employer no longer authorized the care the employee received, not whether the employee believed the care was compensable when the employee received it. An employer may avoid liability by showing the employer gave the employee actual notice of a change in authorization as required by section 85.27(4).[14] Alternatively, the employer may prove the employee had knowledge of facts and circumstances that would have led a reasonable-employee to conclude the employer was no longer authorizing care for the claimed injury.[15]
We caution that the outcome under this test does not rely on the concepts of constructive knowledge or constructive notice because section 85,27(4) imposes'no duty of knowledge on employees. See Knowledge, Black’s Law Dictionary (10th ed.2014)'(defining “constructive knowledge”); Notice, Black’s Law Dictionary (defining “constructive notice”)., Likewise, it does not rely on the concepts of implied knowledge, implied notice, or inquiry notice because section 85.27(4) imposes no duty of inquiry on employees. See Knowledge, Black’s Law Dictionary (defining “implied actual knowledge”); Notice, Black’s Law Dictionary (defining “implied notice” and “inquiry notice”).
In addition, we caution that the test we now adopt to determine employer liability for authorized medical expenses under section 85.27(4) does not turn on the subjective beliefs an employee holds with respect to compensability or medical causation.[16] Rather, it is an objective test. *778 This distinction is important because employees are ordinarily laypersons without the expertise necessary to make accurate determinations regarding medical. causation. See Bradshaw v. Iowa Methodist Hosp., 251 Iowa 375, 383, 101 N.W.2d 167, 171 (1960). We long ago recognized that medical causation “is a question with respect to which only a medical expert can express an intelligent opinion.” Id, Thus, an employee’s subjective beliefs concerning the cause of a medical condition or the compensability of expenses incurred are ordinarily incompetent to prove or disprove compensability or medical causation.[17] See Cedar Rapids Cmty. Sch. Dist. v. Pease, 807 N.W.2d 839, 845 (Iowa 2011); Bradshaw, 251 Iowa at 383, 101 N.W.2d at 171. Moreover, in the context of determining whether an employer is liable for authorized care, compensability and medical causation are not even at issue in a claim for reimbursement.[18]
We conclude an employer may prove it is not liable for the cost of care an employee received from an authorized medical provider despite the employer’s failure to give the notice section 85.27(4) requires under limited circumstances. However, when an employer seeks to avoid liability for care an employee received from an authorized provider and cannot prove it notified an employee it was not authorizing further care from that provider, the employer bears the burden of proving by a preponderance of the evidence the employee knew or reasonably should have known either that the care the employee received was unrelated to the medical condition or conditions upon which the employee’s claim for workers’ compensation benefits is based or that the employer no longer authorized the care the employee received at the time the employee received it.
In determining whether the employer has proven by a preponderance of the evidence the employee knew or reasonably should have known it no longer authorized the care the employee received at the time the employee received it, the commissioner shall consider the following facts and circumstances: (1) the method in which the employer communicated to the employee that care was authorized throughout the period during which the employer concedes care was authorized; (2) the actual communications between the employer and employee throughout that period and thereafter concerning the injury, the care, and the costs of the care; (3) *779 any communications between the employee and medical providers;,’ (4) how much time passed between the date the' employer authorized care and the date the employee sought the disputed care; (5) the -nature of the injury for which the employer authorized care; (6) the nature of the:care the employee received, including the overall course of the care and the frequency with which the .employee sought or received care throughout the period during which the employer concedes care was authorized and thereafter; and (7) any other matters shown by the evidence to bear on what the employee knew or did not know with respect to the question of whether .the employer authorized the care sought when the employee received it. If the employer proves the employee knew or reasonably should have known the employer did not authorize further care when he or she received care from a previously authorized provider, the employer is not liable for the cost of the unauthorized care.
Our resolution of the statutory interpretation issue in this case protects the interests of both employers and employees and honors the legislature’s intent in enacting and amending section 85.27(4). By construing section 85.27(4) to avoid .potential due process problems that could arise when an employee is denied reimbursement of medical expenses without notice from the employer, our interpretation of section 85.27(4) is also consistent with the principle of constitutional avoidance. See Auxier v. Woodward State Hosp.-Sch., 266 N.W.2d 139, 142 (Iowa 1978) (concluding a claimant’s interest in workers’ compensation benefits constitutes a property right an employer cannot terminate without pri- or notice).
The commissioner made no findings of fact that would permit us to assess whether Ramirez-Trujillo knew or reasonably should have known Quality Egg no longer authorized further care by Wright Medical Center for her. back injury when she sought and received, care from May 2010 through April 2011. Therefore, remand is appropriate because we are unable to determine from this record whether Quality Egg is liable for the medical expenses Ramirez-Trujillo incurred during this period under our interpretation of section 85.27(4). On remand, the commissioner should find the facts necessary to determine whether Quality Egg proved by a preponderance of the evidence that Ramirez-Trujillo knew or reasonably should have known Quality Egg no longer authorized further care for her back injury when she incurred the' disputed medical expenses. If the commissioner allows further testimony, the commissioner may properly limit that testimony to matters as to which each witness has not previously testified. Winnebago Indus. v. Smith, 548 N.W.2d 582, 584 (Iowa 1996).
IV. Disposition.
We affirm in part the decisions of the court of appeals and the district court. The court of appeals decision stands as the final decision of this court to the extent it affirmed the district court decision affirming in part the final agency decision. We reverse in part the district court judgment and remand the case to the district court with instructions to remand the case to the commissioner for further proceedings consistent -with this opinion.
DECISION OF COtJRT OF APPEALS AFFIRMED IN PART AND VACATED IN PART; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED WITH INSTRUCTIONS.
All justices, concur except HECHT, J., who dissents.

. Throughout the remainder of this opinion, .‘‘Quality Egg” ’ refers to Ramirez-Trujillo’s employer and its insurer,

. Ramirez-Trujillo did not seek reimbursement of the medical expenses she incurred during December 2009,

. Ramirez-Trujillo had previously visited Wright Medical Center for treatment of back pain even before she began working for Quality Egg. In January 2006, Ramirez-Trujillo went to the emergency room at Wright Medical Center, complaining of lower back pain after slipping and falling on ice.

. Though Ramirez-Trujillo admitted her back once locked up as she walked up the three stairs outside her home, she denied ever having fallen down them. Her' testimony suggested those were the only stairs at her home.

. The legislature enacted the language in section 85.27(4) granting employers a right to choose care in 1976. 1976 Iowa Acts ch. 1084, § 3 (codified in relevant part at Iowa Code § 85.27 (1977)); Bell Bros., 779 N.W.2d at 202 n. 1. The legislature enacted-the second sentence of section 85,27(4) in 2004. See 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001,- § 9 (codified at Iowa Code § 85.27(4) (2005)).

. Though we conclude deference to the agency’s interpretation is not appropriate, we note the commissioner previously reached the same conclusion in interpreting section 85.27(4). See, e.g., Warner v. Alpha's, Iowa Workers’ Comp. Comm’n No. 1269904, 2002 WL 32125384, at *6 (Sept. 9, 2002)'(“An employer's act of directing the care and the claimant’s compliance with the employer’s directives binds defendants to pay the cost of the care that it chose. Employers are under an obligation to monitor the care they authorize and must pay for authorized care until the time they inform the employee that they are withdrawing authorization.” (Citation omitted.)).

. An employer may successfully assert a lack-of-authorization defense when an employee seeks reimbursement for unauthorized care obtained after the workers’ compensation commissioner denies the employee's application for alternate care on the merits.' Bell Bros., 779 N.W.2d at 205; R.R. Donnelly, 670 N.W.2d at 197-98.

. Notably, the commissioner has adopted-two regulations that bolster our conclusion-an employee is entitled to be informed when an employer decides it will no longer authorize care. First, the commissioner will not hear the parties on an application for alternate care until the employee communicates the basis of his or her dissatisfaction to the employer. See Iowa Admin. Code. r. 876— 4.48(4), (8); see also Iowa Code § 85.27(4) (stating an employee with reason to be dissatisfied with the care offered "should communicate the basis of such dissatisfaction to the employer, in writing If requested”). As: a result, the employee cannot recéive an order directing the employer to pay for alternate care until he or she knows that care will be denied by the’ employer. Second, the commissioner will dismiss an' application' for alternate cáre if the employer denies the condition for which care is sought is compensable. R.R. Donnelly, 670 N,W.2d at 196, 197; see Iowa Admin." Code r. 876—4.48(7). Thus, an employee needs to know whether to apply for alternate cafe or seek adjudication on com-pensability in order to avoid delayed reimbursement for expenses incurred in seeking care.

. We note this conclusion is consistent with prior interpretations of section 85.27(4) by the commissioner. See Warner, 2002 WL 32125384, at *6 (“When an employer chooses the care it must pay for the care it chose, even if it later learns that it might not have been liable for that care if it had not directed the care.”).

. We have never considered the question of whether section 85.27(4) requires an employee to prove compensability of the condition for which treatment was sought to establish an entitlement to reimbursement of authorized medical expenses. We once reinstated a ruling by the commissioner disallowing medical expenses because "the claimant had failed to present sufficient evidence to prove a causal connection between the conditions which were the subject of the treatment and the claimant’s work-related injury.” Auxier v. Woodward State Hosp.-Sch., 266 N.W.2d 139, 144 (Iowa 1978). However, we did so because the trial court erroneously determined the claimant had established a causal connection between the conditions treated and the workplace injury as a matter of law. See id. In that case, we did not consider whether section 85.27(4) requires reimbursement of authorized medical expenses not causally connected to a workplace injury. See id. Because that question was not actually presented and decided in Auxier, we do not treat that case as controlling.
The commissioner's interpretation of the statute on this question is not entitled to deference. See Iowa Code § 17A. 19(11)(&). Nonetheless, we note the commissioner no longer interprets section 85.27(4) to require an employee to demonstrate authorized medical expenses were causally connected to the workplace injury to establish an entitlement to reimbursement. See, e.g., Norton v. Leonard Express, Inc., Iowa Workers' Comp. Comm’n No. 5027578, 2013 WL 482726, at *2 (Jan. 23, 2013) ("Employer[s] must pay for the care they authorize, even if that care was later on determined unrelated to the work injury.”); Lenzini v. Des Moines Area Cmty. Coll., Iowa Workers' Comp. Comm’n No. 5002823, 2003 WL 22513678, at *5 (Oct. 29, 2003) ("When an employer chooses the care it must pay for the care it chose, even if it later learns that it might not have been liable for that care if it had not directed the care.”).

. We previously determined section 85.27(4) implicitly limits employer liability for unauthorized care. See Bell Bros., 779 N.W.2d at 206 (indicating an employee may generally recover medical expenses incurred in seeking unauthorized care upon proving by a preponderance of the evidence that such care was reasonable and beneficial under the totality of the circumstances). Because it would be unfair to impose the cost of care the employer chose on the employee merely because it was not reasonable or turned out not to be beneficial, we do not interpret section 85.27(4) to implicitly limit employer liability for authorized care in precisely the same manner.

. The statute' requires an employer to hold an employee harmless for the cost of authorized care until it notifies the employee it is no longer authorizing care, but it does not indicate that care remains authorized until the employer notifies the employee it is no longer authorizing care. See Iowa Code § 85.27(4).

. We agree with the commissioner an employer “cannot revoke authorization retroactively to avoid liability for expenses previously incurred.” Warner, 2002 WL 32125384, at *6.

. In other words,' the employer may disprove liability by showing it notified the employee that the employer was "no-longer authorizing all or any part of the care and the reason for the change in authorization.” Iowa Code § 85.27(4).

. Of course, if it turns out the care was related to a workplace injury, the employer must pay for care regardless of what the employee knew or should have known at the time unless the employer, proves it notified the employee of a change in authorization. Employer liability for authorized care does not turn on the beliefs of the employee. Warner, 2002 WL 32125384, at *6 ("It is unreasonable to expect a claimant to have the medical expertise necessary to decide whether to accept the care directed by the employer upon the chance the employer might later deny liability for the condition being treated. Lay persons, such as claimant, are not competent to testify on the issue of medical causation because they lack competency to do so. They are rió more competent when they are receiving the care, than when testifying.”).

. This conclusion arguably follows from the fact that employer liability for authorized care does not turn on the compensability of the injury. As the commissioner has recognized, it would be unreasonable for employer liability to turn on the beliefs of the employee. Warner, 2002 WL 32125384, at *6.

. It is irrelevant whether the employee’s subjective belief was based on statements made , by a medical professional. As the evidence before the hearing deputy in this case demonstrates and the commissioner surely knows, medical professionals often arrive at conflicting conclusions regarding medical causation. See Warner, 2002 WL 32125384, at *6 ("Medical experts commonly disagree as to the cause of a condition and an injured claimant cannot be held to know when to accept and when to reject the care the employer’s physicians offer.”). Generally, an expert opinion regarding medical causation is not determinative in a claim for workers’ compensation benefits. See Cedar Rapids Cmty. Sch. Dist. v. Pease, 807 N.W.2d 839, 845 (Iowa 2011). Rather, it is within the province of the commissioner to accept or reject an expert opinion. Id.

. Employee statements indicating an employee subjectively believed the employer was no longer authorizing further care are relevant to determining whether the employee knew the employer was no longer authorizing care he or she received. However, because the overarching purpose of the workers’ compensation statute is to protect workers, ambiguous statements should be construed as statements concerning causation or compens-ability and not as statements concerning the effectiveness of a prior authorization for care unless circumstances clearly suggest the latter interpretation is more appropriate. Employees are generally lay persons not familiar with the legal standards applied in assessing their workers’ compensation claims.