# IN THE SUPREME COURT OF IOWA

No. 08–1208

Filed June 4, 2010

**CLAY COUNTY, IOWA,**

Appellant,

vs.

**PUBLIC EMPLOYMENT RELATIONS
BOARD** and **INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 234,**

Appellees.

Appeal from the Iowa District Court for Clay County, David A. Lester, Judge.

The county appeals a district court judgment affirming a decision of the Iowa Public Employment Relations Board requiring it to reinstate a terminated employee. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**

Michael J. Houchins, County Attorney, for appellant.

Jan V. Berry, Des Moines, for appellee Board.

MacDonald Smith of Smith & McElwain Law Office, Sioux City, for appellee Union.

**WIGGINS, Justice.**

In this appeal, we must determine whether Iowa's Public Employment Relations Act (PERA) protects a public employee's activity in negotiating wages for himself and others with a nonpublic employer. Because we find the PERA does not protect such activity, we reverse the judgment of the district court affirming the Public Employment Relations Board's decision and remand the case to the district court with instructions to remand the case to the board and order the board to reverse its decision and dismiss the complaint.

## I. Background Facts and Proceedings.

From October 19, 1984, until his termination on October 29, 2004, James Sikora was a full-time equipment operator for Clay County. The head of the department at the time of Sikora's termination was county engineer, Scott Rinehart. During Sikora's employment with the county, the International Union of Operating Engineers, Local 234 was the certified bargaining representative of a bargaining unit consisting of certain Clay County secondary roads department employees, which included Sikora.

In addition to his full-time job, the Clay County Fair Board, a private nonprofit corporation, also employed Sikora part-time. Sikora worked for the fair since 1993. Sikora was one member of a crew performing maintenance on the gravel streets and the racetrack area using equipment either loaned or rented to the fair by the county. The other crewmembers consisted of two other full-time county employees, Rob Kluender and Jim Montgomery, and two other men who were employed full-time in the private sector. Sikora worked part-time for the fair by working after his normal hours for the county, working on days off, and working on vacation days. In 2003 Sikora was paid

approximately $7.50 an hour at his part-time job with the fair and roughly $16 an hour at his full-time job with the county.

In 2003 Sikora and Kluender met with Phil Hurst, the manager of the fair, to request a raise for the crew. Sikora told Hurst he felt he and the crew were doing a good job and that they needed to receive more compensation for their work. Hurst told Sikora he would think about the issue and get back to him. Hurst failed, however, to get back with Sikora. In April 2004, and again in May or June, Sikora spoke with Hurst alone in his office and asked about the status of wage increases for himself and the crew. Hurst told Sikora the fair had a tight budget and he had not yet made a decision on the issue.

In July Sikora went to Hurst's office and discussed the issue of wage increases again. Hurst said he had not yet decided to implement a raise. At this point, Sikora claims he merely told Hurst that he did not know if he could continue to work for the fair if he did not receive a raise. Hurst claims Sikora told him, due to the expensive nature of the county's equipment the crew was using at the fairgrounds, Rinehart told Sikora he could not operate the equipment unless he was being paid at the same or a comparable salary as the salary he earned working for the county. Regardless of which account is accurate, after learning how much Sikora earned an hour while working for the county, Hurst asked Sikora whether a raise to $12.50 an hour for Sikora, a raise to $10.50 an hour for Kluender, and a $1.00 an hour raise for the rest of the crew would be a sufficient raise. Sikora agreed to the raise, Hurst implemented it, and Sikora and the rest of the crew continued to work for the fair in the summer and fall of 2004.

Also in July 2004 the fair needed more gravel for its streets. The county informed Sikora that he was not permitted to use county trucks

to transport the gravel. Instead, the county would transport the gravel to the fairgrounds during its regular work schedule. Accordingly, Sikora told Hurst he could not haul gravel to the fairgrounds; instead, if Hurst needed more gravel he should contact Rinehart's office to arrange for the county to haul the gravel to the fairgrounds during the county's regular workday. Hurst contacted Rinehart's office to request the use of the county's trucks to haul gravel to the fairgrounds. Subsequently, John Rosacker, the road and maintenance foreman and Sikora's immediate supervisor, went to the fairgrounds and relayed the same message that Sikora had given Hurst. During this conversation, Hurst told Rosacker that he "had been led to believe that Mr. Rinehart was requiring that we pay comparable wages" to Sikora and the crew as a condition of being able to use the county's equipment. Rosacker relayed this message to Rinehart, who came to the fairgrounds and told Hurst this statement was a lie.

Upon Rinehart learning of Sikora's alleged statement, he told Hurst "there is probably some disciplinary action that needed to be taken" and asked Hurst to write down what happened in a memo. Hurst agreed to do so, but not until the fair ended due to his busy work schedule. At the end of September or the first part of October, Rinehart called Hurst and again asked him to write down what had happened. Consequently, Rinehart set up a meeting on October 20 between Hurst and Clay County assistant attorney, Michael J. Houchins. After the meeting, Houchins summarized what Hurst had said in a letter and sent it to Rinehart. Rinehart received the letter on approximately October 27 or 28 and it stated in pertinent part:

> Soon after Ike stated that he would not be coming back, Sikora came to visit with Phil Hurst. At that time, Phil did not know [Rinehart] and had not visited with [him] about

> using the County equipment at the fair. Sikora then stated to Phil Hurst that because of the expense of the equipment, approximately $100,000 worth of equipment, that [Rinehart] stated that Sikora could not be operating the equipment unless working at the same salary that he was receiving while working for the County. Sikora emphasized to Phil that they needed more money to work. He indicated that the only way they could work and use the County equipment was if they were paid more. It was then agreed that Jim Sikora would receive $12.50 an hour, and Rob Kluender would also receive a raise. Phil was led to believe that he had to pay the $12.50 per hour to Sikora, or the Clay County Fair would not be able to use County equipment.

On October 29 Rinehart met with Rosacker and Sikora and terminated Sikora's employment with the county. Rinehart gave Sikora a copy of the letter detailing Hurst's statement, handed Sikora his last paycheck, and told him the county had terminated his employment. The only reason given for Sikora's termination was Hurst's allegations contained in the above-mentioned letter.

On November 29 the union filed a prohibited practice complaint with the board against the county and Rinehart. The complaint alleged the county and Rinehart had engaged in prohibited practices under the PERA by discharging Sikora for engaging in "union activities and other concerted activities for mutual aid and [protection] not prohibited by law." The board held a hearing on the union's complaint before an administrative law judge (ALJ).

The ALJ adopted Sikora's version of events and stated, "I cannot reasonably conclude that Sikora said what Hurst alleged without the County providing Sikora with an opportunity prior to discharge to defend himself against the allegation." Consequently, the ALJ concluded the county wrongfully terminated Sikora for engaging in protected concerted activities under the PERA and ordered the county to reinstate Sikora to

his former job with full back pay and benefits. The county appealed to the board from the ALJ's proposed decision and order.

The board did not adopt the ALJ's findings of fact or conclusions of law. The board determined Sikora's testimony was more credible and Sikora did not make the coercive statements Hurst attributed to him as set out in the letter. Although the board applied a different legal analysis than the ALJ, it ultimately concluded the county wrongfully terminated Sikora for engaging in protected concerted activities under the PERA—negotiating wages—and ordered the county to reinstate Sikora with full back pay and benefits.

The county filed a petition for judicial review of the board's final decision. The district court affirmed the board's decision. The county appeals.

**II. Issue.**

The only issue we need to reach to dispose of this appeal is whether the board correctly found that Sikora's conduct in negotiating wages for himself and others with a nonpublic employer was a protected activity falling within the scope of the PERA.

**III. Scope of Review.**

To decide this issue, we must determine the proper scope of the rights of public employees contained in section 20.8(3) of the PERA. *See* Iowa Code § 20.8(3) (2003). Specifically, we must decide whether the rights contained in section 20.8(3) protect Sikora's activities in negotiating wages for himself and the other employees working for the fair. Our primary goal when we interpret a statute is to ascertain the legislature's intent. *State v. Pub. Employment Relations Bd.*, 744 N.W.2d 357, 360 (Iowa 2008). In doing so, we seek a " 'reasonable interpretation

that will best effect the purpose of the statute.' " *Id.* at 361 (quoting *IBP, Inc. v. Harker*, 633 N.W.2d 322, 325 (Iowa 2001)).

Ordinarily, the interpretation of a statute is a matter of law for us to decide. *Id.* at 360. However, when the legislature has clearly vested the interpretation of a statute by a provision of law in the discretion of the agency, we review the agency's interpretation of the statute to determine if its interpretation is irrational, illogical, or wholly unjustifiable. Iowa Code § 17A.19(10)(*l*). This is not one of those situations.

We recently discussed the analysis used to determine whether the legislature clearly vested an agency with the authority to interpret a statute. *See Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 11–12 (Iowa 2010). When the legislature has not explicitly given an agency the authority to interpret a statute, we must examine "the phrases or statutory provisions to be interpreted, their context, the purpose of the statute, and other practical considerations to determine whether the legislature intended to give interpretive authority to an agency." *Id.* Here, the legislature has given the board the authority to administer the provisions of chapter 20, collect data, perform studies, establish procedures, hold hearings, and adopt rules. Iowa Code § 20.6. The legislature has not given the board the explicit authority to interpret the PERA. Therefore, we must examine the specific statutory provision at issue in this case and decide whether the legislature intended the board to have interpretive authority with respect to that provision.

The outcome of this case depends on the scope of coverage of the PERA as indicated by the public policy of the act. The legislature has set forth the public policy of the act in the Code. Iowa Code § 20.1. Only the legislature can define the scope of legislative actions. The board can

only act within that scope of coverage. Thus, it is our task and not the board's to determine the scope of the PERA. Accordingly, the board's interpretation of the scope of coverage of the PERA is not entitled to review under section 17A.19(10)(*l*) and our review is for correction of errors of law under section 17A.19(10)(*c*).

## IV. Discussion and Analysis.

The Iowa Code provides:

> Public employees shall have the right to:
>
> . . . .
>
> 3. Engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection insofar as any such activity is not prohibited by this chapter or any other law of the state.

Iowa Code § 20.8(3). The union claims even though the fair is a private employer, Sikora's activity in negotiating wages with the fair for himself and his fellow employees is a protected activity under section 20.8(3); thus, Sikora's public employer, the county, was prohibited from terminating him for engaging in this activity. In support of its claim, the union relies on the federal courts' interpretation of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–69 (2000).

In interpreting the NLRA, the federal courts have refused to limit the scope of the NLRA's right to engage in "concerted activity" for the purpose of "other mutual aid or protection" to conduct directed at the employee's own employer. Instead, the federal courts have extended this right outside of an employee's own employment relationship to third parties, administrative and judicial forums, appeals to legislators, and "concerted activity" for the purpose of "other mutual aid or protection" aimed at another employer. *See, e.g., Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–67, 98 S. Ct. 2505, 2512–13, 57 L. Ed. 2d 428, 438–39 (1978)

(recognizing employees can seek to improve the terms and conditions of their employment outside the immediate employee-employer relationship such as through administrative and judicial forums, and by appealing to legislators to protect their interests); *Compuware Corp. v. NLRB*, 134 F.3d 1285, 1291 (6th Cir. 1998) (recognizing "[e]mployees have the right to engage in concerted communications with third parties regarding legitimate employee concerns"); *NLRB v. J.G. Boswell Co.*, 136 F.2d 585, 595 (9th Cir. 1943) (finding the fact that an alleged union activity extends outside the employee's own employment is immaterial when determining if the NLRA was violated); *Fort Wayne Corrugated Paper Co. v. NLRB*, 111 F.2d 869, 874 (7th Cir. 1940) (recognizing employees have the right to join and participate in union activities outside of their employment); *A-W Wash. Serv. Station, Inc.*, 258 N.L.R.B. 164, 165 (1981) (recognizing the NLRA forbids discrimination intended to discourage union activity aimed at another employer); *Wash. State Serv. Employees State Council No. 18 & Local 6*, 188 N.L.R.B. 957, 958–59 (1971) (holding protesting employee was engaged in concerted activity for mutual aid or protection even though demonstration was not aimed at the hiring practices of her own employer); *Bob's Casing Crews, Inc.*, 178 N.L.R.B. 3, 5 (1969) (recognizing employee was engaged in concerted activity for mutual aid or protection when he left jobsite of different employer in protest of excessive work hours); *Gen. Elec. Co.*, 169 N.L.R.B. 1101, 1103–04 (1968) (recognizing that collecting money in support of employees of other employers is concerted activity for the purpose of other mutual aid or protection), *enforced*, 411 F.2d 750 (9th Cir. 1969) (per curiam). These courts have recognized that: (1) nothing in the NLRA limits this right to conduct directed at the employees' own employer, (2) the NLRA describes this right with the extremely broad language of

"mutual aid or protection," and (3) the rationale and public policy underlying this right forbids such a limitation. *See, e.g., Eastex, Inc.,* 437 U.S. at 565–67, 98 S. Ct. at 2512–13, 57 L. Ed. 2d at 438–39 (recognizing the broad language of "mutual aid or protection" allows employees to improve the terms and conditions of their employment outside of the employee-employer relationship and to hold otherwise would frustrate the policy of the NLRA); *Fort Wayne Corrugated Paper Co.,* 111 F.2d at 874 (citing the national scope of unionism as a policy reason for refusing to limit protected union activities to intracompany relations); *Wash. State Serv. Employees State Council No. 18 & Local 6,* 188 N.L.R.B. at 958–59 (noting nothing in the NLRA places any limitation on the term "concerted" which would warrant finding an employee who engages in concerted activities with employees of other employers is not protected under the NLRA); *Gen. Elec. Co.,* 169 N.L.R.B. at 1103 (recognizing the NLRA does not limit the scope of the term "concerted activities" to the employee-employer relationship and its rationale forbids such a limitation).

Even though the federal courts have held the protection of the NLRA extends to protected activities outside the direct employer-employee relationship, we find the PERA does not protect a public employee's activities with another nonpublic employer. We reach this conclusion for a number of reasons.

First, the purposes of the NLRA and the PERA are different. In regards to the NLRA, Congress has stated:

> It is declared hereby to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full

freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection.

29 U.S.C. § 151. The Iowa legislature has stated the purpose of the PERA is as follows:

The general assembly declares that it is the public policy of the state to promote harmonious and co-operative relationships between government and its employees by permitting public employees to organize and bargain collectively; to protect the citizens of this state by assuring effective and orderly operations of government in providing for their health, safety, and welfare; to prohibit and prevent all strikes by public employees; and to protect the rights of public employees to join or refuse to join, and to participate in or refuse to participate in, employee organizations.

Iowa Code § 20.1(1).

We can understand how the federal courts interpret the NLRA's protected activities broadly because its purpose is to "eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions." 29 U.S.C. § 151. To accomplish this purpose, it is necessary to protect an employee even when that employee engages in a protected activity with an employer other than his or her own employer.

On the other hand, the purpose of the PERA is not to deal with the free flow of commerce, but "to promote harmonious and co-operative relationships between government and its employees." Iowa Code § 20.1(1). Thus, the PERA's focus is more limited than the NLRA's and is centered on the relationship between government and its employees. The protected activities under the PERA are not directed to *any* employer, but rather are directed towards the *government* as the employer. The activity

at issue in the present case was directed toward a private employer, a relationship outside those identified in section 20.1(1).

Another reason we find the PERA's protection is not as expansive as the NRLA's is that the acts define the protected employee differently. The NLRA states, "The term 'employee' shall include any employee, and *shall not be limited to the employees of a particular employer*, unless this subchapter explicitly states otherwise. . . ." 29 U.S.C. § 152(3) (emphasis added). The Supreme Court relied on the language, "shall not be limited to the employees of a particular employer," to find a congressional intent "to protect employees when they engage in otherwise proper concerted activities in support of employees of employers other than their own." *Eastex, Inc.*, 437 U.S. at 564, 98 S. Ct. at 2511–12, 57 L. Ed. 2d at 438.

Iowa's definition of public employee "means any individual employed by a public employer, except individuals exempted under the provisions of section 20.4." Iowa Code § 20.3(10). By not including a phrase similar to the phrase "shall not be limited to the employees of a particular employer," the Iowa legislature intended the PERA's coverage to be narrower than the NLRA's.

Moreover, we do not see how allowing a public employee to negotiate a contract for nonpublic employees promotes harmonious and cooperative relationships between the government and its employees. Factually, it may do just the opposite. If a public employee negotiates favorable terms of employment with a nonpublic employer, the terms of the nonpublic employment may be such as to cause the public employee to leave public employment or become dissatisfied with the terms of employment with the public employer. Either situation will not promote harmonious and cooperative relationships between the government and its employees.

Accordingly, we hold the scope of coverage of the PERA does not protect Sikora's activity in negotiating wages for himself and other employees with a nonpublic employer such as the fair. Consequently, the board's interpretation of section 20.8(3), holding these activities are protected, is erroneous.

**V. Disposition.**

The board erroneously determined the PERA protected Sikora's activity in negotiating wages for himself and other employees with a nonpublic employer. The district court affirmed the board's decision. Therefore, we reverse the district court's affirmance of the board's decision. For that reason, we remand this case to the district court to enter an order remanding the case to the board with instructions requiring the board to reverse its decision and enter an order dismissing the union's prohibited practice complaint.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH INSTRUCTIONS.**