# IN THE SUPREME COURT OF IOWA

No. 15–1248

Filed April 21, 2017

Amended July 10, 2017

**LYLE H. ABBAS, F. DOW BATES, BRADLEY J. BROWN, SIDNEY E. CARTER, BRAD CHICOINE, RUSSELL J. COX, PAUL D. EBERLINE, JOSEPH N. GEELAN, RICHARD W. HAAS, REX J. JONES, KEITH L. KLEMME, ELIZABETH C. KRESSIN, STEVEN J. KRAUS, MARK A. KRUSE, RODNEY D. LANGEL, RONALD O. MASTERS II, KEVIN MILLER, STEVEN A. MUELLER, MARK A. NILES, VALORIE J. PRAHL, JENNIFER A. RASMUSSEN, ROD R. REBARCAK, RANDALL P. STANGE, LANCE E. VANDERLOO, KENNETH W. VAN WYK,** and **BEN WINECOFF,**

Appellants,

**vs.**

**IOWA INSURANCE DIVISION,**

Appellee,

**WELLMARK, INC. d/b/a WELLMARK BLUE CROSS AND BLUE SHIELD OF IOWA,** and **WELLMARK HEALTH PLAN OF IOWA, INC.,**

Intervenors.

---

Appeal from the Iowa District Court for Polk County, Karen A. Romano, Judge.

A group of chiropractors appeals a judicial review proceeding in which the district court upheld a decision of the insurance commissioner finding the insurers did not violate Iowa Code section 514F.2 (2013). **AFFIRMED.**

Glenn L. Norris of Hawkins & Norris, P.C., Des Moines, and Steven P. Wandro and Kara M. Simon of Wandro & Associates, P.C., Des Moines, for appellants.

Thomas J. Miller, Attorney General, and Jordan Esbrook, Assistant Attorney General, for appellee.

Ryan G. Koopmans and Hayward L. Draper of Nyemaster Goode, P.C., Des Moines, for intervenors.

**WIGGINS, Justice.**

Twenty-six chiropractors petitioned for judicial review of the Iowa Insurance Commissioner's decision that health insurers did not violate Iowa Code section 514F.2 (2013). The district court upheld the commissioner's decision, and the chiropractors appealed. We hold that (1) the interpretation of section 514F.2 has not been clearly vested by a provision of law in the discretion of the commissioner, (2) section 514F.2 regulates payments to providers, (3) the health insurer's payments for chiropractic care are not based solely on licensure, and (4) the Employee Retirement Security Program (ERISA) preempts the application of Iowa Code section 514F.2 to self-funded health plans. Accordingly, we affirm the judgment of the district court.

## I. Background Facts and Proceedings.

The appellants are Iowa-licensed chiropractors. Chiropractors obtain a license in Iowa by completing a high-school education, graduating from an approved college of chiropractic, and passing an exam issued by the board of chiropractic. Iowa Code § 151.3. A chiropractic license does not authorize a chiropractor to practice surgery or administer or prescribe prescription drugs or controlled substances. *Id.* § 151.5.

The intervenor in this case is Wellmark, Inc. d/b/a Wellmark Blue Cross and Blue Shield of Iowa and Wellmark Health Plan of Iowa, Inc. Wellmark sells health insurance plans to individuals and employer groups. It also provides administrative services to assist others who provide health insurance coverage, such as self-funded governmental entity plans. *Mueller v. Wellmark, Inc.*, 818 N.W.2d 244, 248 (Iowa 2012). Wellmark offers both preferred provider organization (PPO) plans and health maintenance organization (HMO) plans.

For the PPO, Wellmark creates a network of preferred healthcare providers, including doctors of chiropractic, medical doctors, and osteopathic doctors. *Mueller*, 818 N.W.2d at 248. It incentivizes its members to use its preferred provider panel. *Id.* Chiropractors are preferred providers of Wellmark's PPO network. Wellmark enters into contracts governing the terms and conditions of treatment as well as fee schedules with its preferred providers. *Id.* Preferred providers must adhere to these contracts to receive compensation from Wellmark for services provided to Wellmark's members. *Id.* Preferred provider arrangements are expressly encouraged by the Iowa legislature as a healthcare cost control mechanism. *See* Iowa Code § 514F.2. The legislature has directed the commissioner to regulate these preferred provider arrangements. *Id.* § 514F.3.

For the HMO, Wellmark has an agreement with the Iowa Chiropractic Physicians Clinic (ICPC), a chiropractic network, to provide care to its members. Wellmark pays ICPC a certain rate per member regardless if members seek chiropractic care, which is an arrangement known as a capitated rate.

Prior to 1986, Iowa law prohibited coverage for chiropractic services by healthcare service corporations. *Health Care Equalization Comm. of Iowa Chiropractic Soc. v. Iowa Med. Soc.*, 501 F. Supp. 970, 990 (S.D. Iowa 1980), *aff'd*, 851 F.2d 1020 (8th Cir. 1988). In 1986, the legislature enacted House File 2219 to provide for the "payment by corporations subject to chapters 509, 514, and 514B for services performed by chiropractors." 1986 Iowa Acts ch. 1180. The Code now requires

> payment or reimbursement for necessary diagnosis or treatment provided by a chiropractor licensed under chapter 151, if the diagnosis or treatment is provided within the

scope of the chiropractor's license and if the policy would pay or reimburse for the diagnosis or treatment by [medical doctors and osteopathic doctors] of the human ailment, irrespective of and disregarding variances in terminology employed by the various licensed professions in describing the human ailment or its diagnosis or its treatment.

Iowa Code § 509.3(1)(*f*) (2013). It is undisputed chiropractors have agreements with Wellmark to provide services to its members in the PPO and HMO networks for payment or reimbursement. It is also undisputed Wellmark's PPO pays chiropractors less than licensed medical doctors and osteopathic doctors for several services, including office visits, manual adjustments, and x-rays. Further, the fees paid at a capitated rate to the chiropractors in the HMO network are less than the fees paid by Wellmark to the chiropractors in Wellmark's PPO network.

Following our decision in *Mueller v. Wellmark*, 818 N.W.2d at 258, where we ruled that Iowa Code section 514F.2 does not grant a private right of action and dismissed the claim, the chiropractors brought this action. On November 30, 2012, the chiropractors submitted a request for contested case proceeding to the commissioner, alleging Wellmark wrongfully imposes restrictions and pays lower rates for chiropractic services than for equivalent services offered by medical and osteopathic doctors in violation of Iowa Code section 514F.2.

Section 514F.2 provides,

Nothing contained in the chapters of Title XIII, subtitle 1, of the Code[1] shall be construed to prohibit or discourage insurers, nonprofit service corporations, health maintenance organizations, or self-insurers for health care benefits to employees from providing payments of benefits or providing care and treatment under capitated payment systems, prospective reimbursement rate systems, utilization control systems, incentive systems for the use of least restrictive and least costly levels of care, preferred provider contracts limiting choice of specific provider, or other systems,

[1]Commencing with chapter 505. *See* Iowa Code chs. 505–523I.

methods or organizations designed to contain costs without sacrificing care or treatment outcome, provided these systems do not limit or make optional payment or reimbursement for health care services on a basis solely related to the license under or the practices authorized by chapter 151 or on a basis that is dependent upon a method of classification, categorization, or description based upon differences in terminology used by different licensees under the chapters of Title IV, subtitle 3, of the Code in describing human ailments or their diagnosis or treatment.

Iowa Code § 514F.2.

On December 14, the parties submitted a stipulation outlining the issues for the commissioner to decide:

> 1. Are the fees paid by Wellmark, Inc. to chiropractors unlawfully discriminatory in violation of Iowa Code § 514F.2?
>
> (a) Does the Wellmark annual fee schedule for the year beginning July 1, 2012, applicable to individual or other fully-insured coverages limit payment for health care services on a basis solely related to the license under or the practices authorized by Iowa Code chapter 151 in such a manner as to violate the provisions of Iowa Code § 514F.2?
>
> (b) Does the Wellmark annual fee schedule for the year beginning July 1, 2012, applicable to self-funded group health plans that are administered by Wellmark, or to Blue Card claims administered by Wellmark, limit payment for health care services on a basis solely related to the license under or the practices authorized by Iowa Code chapter 151 in such a manner as to violate the provisions of Iowa Code § 514F.2?
>
> 2. Is the capitated payment plan used for chiropractic coverage by Wellmark Health Plan of Iowa, Inc., unlawfully discriminatory in violation of Iowa Code § 514F.2?
>
> (a) Does the capitated services payment system which Wellmark Health Plan of Iowa, Inc., has put in place for its Blue Advantage coverage for payment for services of Iowa chiropractors limit payment for health care services on a basis solely related to the license under or the practices authorized by Iowa Code chapter 151 in a manner that violates Iowa Code § 514F.2?
>
> (b) Does the provision in the capitated services payment system used for Wellmark Health Plan of Iowa, Inc.'s Blue Advantage coverage violate the provisions of Iowa Code § 514F.2 with regard to a referral from the member's

primary care physician being required after 12 chiropractic visits for a particular condition?

On August 28, 2013, the parties substituted updated stipulations that set forth the only issues to be decided by the agency. The updated stipulations are as follows:

> 1. Petitioner will present this Stipulation as their prima facie case for the hearing in this matter, including "Wellmark, Inc.'s July 1, 2013, PPO Fees for Selected CPT and Provider Types," which is attached and which the Petitioners will designate as Exhibit 1. Petitioners claim that the difference in the amount of the fees paid to chiropractors for the same or similar CPT codes as compared to what is paid to MDs and DOs, including the differences in the fees paid for CMT codes as opposed to OMT codes, constitute a violation by Wellmark, Inc. of Iowa Code § 514F.2.
>
> 2. The parties further stipulate that the fees shown on Exhibit 1 are not used by Wellmark Health Plan of Iowa (WHPI), which instead contracts with the Iowa Chiropractic Physicians Clinic (ICPC) to provide a chiropractic network and pays ICPC at a capitated rate, and that ICPC's reimbursement for the CPT codes listed on the attached exhibit is less overall than the fees paid to chiropractors by Wellmark's PPO. Petitioners claim that this constitutes a violation by WHPI of Iowa Code § 514F.2. WHPI typically pays other providers, and in particular MD's and DO's pursuant to the fee schedules and not a contracted network with a capitated rate.
>
> 3. WHPI's Blue Advantage coverage includes a provision with regard to a referral from the member's primary care physician being required after twelve chiropractic visits for a particular condition, as set forth in the attached portion of the current Blue Advantage Benefit Certificate. Petitioners claim that this constitutes a violation by WHPI of Iowa Code § 514F.2.

The agency transferred the matter to the division of administrative hearings for a contested case hearing, and an administrative law judge (ALJ) held the hearing on September 16–18. The ALJ issued a proposed decision on February 21, 2014, concluding,

> Petitioners have not proven Wellmark has violated Iowa Code section 514F.2[.] ERISA preempts application of Iowa Code section 514F.2 to the self-funded health plans Wellmark

administers. The plain meaning of Iowa Code section 514F.2 does not require payment parity, but precludes insurers from restraining or restricting payment or reimbursement solely based on licensure. Petitioners have failed to prove Wellmark's differing unit fee costs for services are solely based on licensure. WHPI's use of a capitated fee agreement with ICPC does not violate Iowa Code section 514F.2. The Division shall take any steps necessary to implement this decision.

After reviewing the ALJ's proposed decision and the record, the commissioner issued a declaratory order instead of treating the matter as a contested case. The commissioner explained that the enforcement of insurance laws "resides exclusively in the office of insurance commissioner" and not with private parties. The commissioner opined that Iowa Code section 514F.2 does not grant

> the insurance commissioner the judicial authority to vindicate the disputes of private parties, whether the complaining entities are health insurance policyholders or health care providers. Iowa Code, Chapter 514F exhibits no legislative intent to transform the insurance commissioner into an insurance claim court.

The commissioner then went on to address the threshold legal question of whether Iowa Code section 514F.2 requires Wellmark to compensate the chiropractors equally with medical and osteopathic doctors in network, concluding that it did not. The commissioner determined Wellmark did not violate section 514F.2, because the statute "does not prohibit insurers, nonprofit service corporations, health maintenance organizations, or self-insurers for health care benefits to employees from engaging in any particular act or practice." But even if it was a regulatory statute, the commissioner found "that any limitation of fees or reimbursement by Wellmark is based upon numerous other factors that have been well established through information gathered in these proceedings." Thus, the commissioner concluded that section 514F.2 "does not preclude Wellmark from differing reimbursements in its

annual fee schedule . . . applicable to individual or other fully-insured coverages." The commissioner also declared ERISA preempts "Iowa Code section 514F.2 from application to the self-funded plans." Additionally, the commissioner concluded the capitated payment systems under Wellmark's HMO do not limit payment for services on a basis solely related to a chiropractor's license in violation of section 514F.2. Finally, the commissioner ruled that the twelve-visit rule under Wellmark's HMO does not violate section 514F.2.

The chiropractors filed a petition for judicial review pursuant to Iowa Code section 17A.19, and the district court affirmed the commissioner's decision. The district court ruled that the proviso clause of section 514F.2 "concerns coverage availability and does not regulate provider in-network fee schedules." The district court found the legislature created section 514F.2 to clarify that House File 2219 "did not prevent insurance companies from utilizing preferred provider contracts as long as the contracts did not limit coverage solely on a basis related to license." "[I]n an abundance of caution," the district court declared "that even if section 514F.2 was regulatory or applied to fee schedules, the Insurance commissioner's determination that Wellmark did not violate section 514F.2 is supported by substantial evidence in the record." The court further affirmed the commissioner's decision that the twelve-visit rule under Wellmark's HMO did not violate section 514F.2, and ERISA preempts section 514F.2 as to Wellmark's self-funded health plans.

The chiropractors appealed the district court's decision.

**II. Issues.**

This appeal presents four issues for review. They are (1) whether the commissioner has the authority to adjudicate a contested case between Wellmark and the chiropractors, (2) whether Iowa Code section

514F.2 regulates payments to providers, (3) whether Wellmark's payments for chiropractic care are based solely on licensure, and (4) whether ERISA preempts the application of Iowa Code section 514F.2 to self-funded health plans. The chiropractors did not present an argument on appeal as to the commissioner's decision on the twelve-visit rule; thus, we will let the district court's decision stand as the final decision on that issue.

### III. Scope of Review.

This is an appeal of a district court's review of agency action. Iowa Code chapter 17A governs judicial review of final decisions by the Iowa Insurance Commissioner. *Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d 138, 142 (Iowa 2013); *see* Iowa Code § 17A.19(1).

We review an agency's interpretation of a provision of law under either the highly deferential "irrational, illogical, or wholly unjustifiable" standard or the nondeferential errors-at-law standard. *Iowa Dental Ass'n*, 831 N.W.2d at 142–43. We will defer to an agency interpretation of a provision when the legislature has clearly vested authority to interpret statutory language in an agency. *Ramirez-Trujillo v. Quality Egg, L.L.C.*, 878 N.W.2d 759, 768 (Iowa 2016).

When the legislature has clearly vested an agency with interpretive authority, we will reverse the agency's ruling only when its interpretation of a statutory provision is "irrational, illogical, or wholly unjustifiable." *Id.* (quoting *Coffey v. Mid Seven Transp. Co.*, 831 N.W.2d 81, 88 (Iowa 2013)); *see* Iowa Code § 17A.19(10)(*l*). However, if the legislature has not clearly vested the agency with interpretive authority, we review questions of statutory interpretation for correction of errors at law. *Ramirez-Trujillo*, 878 N.W.2d at 768; *see* Iowa Code § 17A.19(10)(*c*).

If the legislature has not expressly granted interpretive authority to an agency, we must examine "the phrases or statutory provisions to be interpreted, their context, the purpose of the statute, and other practical considerations to determine whether the legislature intended to give interpretive authority to an agency." *Ramirez-Trujillo*, 878 N.W.2d at 769 (quoting *Clay County v. Pub. Emp't Relations Bd.*, 784 N.W.2d 1, 4 (Iowa 2010)).

"We are more likely to conclude the legislature clearly vested interpretive power in an agency when the agency necessarily must interpret the statutory language at issue in carrying out its duties and no relevant statutory definition applies." *Id.* Further, "when the statutory language at issue is a substantive term within the special expertise of an agency, we generally conclude the legislature has vested the agency with authority to interpret it." *Id.*

> The Iowa Code grants the commissioner the authority to
>
> establish, publish, and enforce rules not inconsistent with law for the enforcement of this subtitle and for the enforcement of the laws, the administration and supervision of which are imposed on the division, including rules to establish fees sufficient to administer the laws, where appropriate fees are not otherwise provided for in rule or statute.

Iowa Code § 505.8(2). Additionally, "Section 514F.3 specifically commands the insurance commissioner to adopt rules and procedures to regulate preferred provider arrangements." *Mueller*, 818 N.W.2d at 256. We note that "the mere grant of rulemaking authority does not give an agency authority to interpret all statutory language." *Iowa Dental Ass'n*, 831 N.W.2d at 144 (quoting *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 519 (Iowa 2012)). While the legislature has granted the

commissioner the authority to make rules for enforcement purposes, it is not the same as granting the commissioner interpretive authority. *Id.*

Further, when examining the proviso clause of section 514F.2, it does not contain a "substantive term within the special expertise of the agency." *Id.* at 145 (quoting *Evercom Systems, Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762 (Iowa 2011)). For these reasons, we will review the commissioner's interpretation of the statute for errors at law.

Next, we address the scope of review as to the agency's factual determinations. We will reverse an agency's decision only when the "determination of fact" is "clearly vested by a provision of law in the discretion of the agency" and an agency's determination "is not supported by substantial evidence in the record." Iowa Code § 17A.19(10)(*f*). Iowa Code section 505.29 authorizes the commissioner to appoint an ALJ to hear contested cases arising from conduct governed by section 514F.2. *Id.* § 505.29. Here, the commissioner appointed an ALJ, the ALJ held an evidentiary hearing, and the commissioner ultimately made factual findings. Thus, the Code vests the agency with the authority to hear contested cases, and the agency "must necessarily make factual findings." *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 465 (Iowa 2004), *superseded by statute*, 2004 Iowa Acts 1st Extraordinary Sess. ch. 1001, §§ 12, 20, *as recognized in JBS Swift & Co. v. Ochoa*, 888 N.W.2d 887, 890, 898 (Iowa 2016).

**IV. Whether the Commissioner Has the Authority to Adjudicate a Contested Case Between Wellmark and the Chiropractors.**

Litigation relevant to this matter began in 2008, when the chiropractors filed an action alleging Wellmark violated antitrust laws, breached a national settlement agreement, and violated Iowa Code

section 514F.2. *See Mueller,* 818 N.W.2d at 247. With respect to section 514F.2, the chiropractors claimed Wellmark engaged in discriminatory practices violating the statute because its preferred provider arrangements limited payments "on a basis solely related" to a chiropractor's license. *Id.* at 254.

In 2012, the matter came before us and we concluded that section 514F.2 does not provide the chiropractors with a private right of enforcement. *Id.* at 255. However, we also included dicta in our opinion opining that the chiropractors may still have a remedy absent an implied cause of action. *Id.* at 257–58. Based on our dicta in *Mueller,* that the chiropractors may initiate contested case proceedings in certain circumstances, the chiropractors filed a request for a contested case proceeding with the Iowa Insurance Division.

In its ruling, however, the commissioner declared that Iowa Code section 514F.2 "does not grant the insurance commissioner the judicial authority to vindicate the disputes of private parties, whether the complaining entities are health insurance policyholders or health care providers." Before making this ruling, the commissioner referred this matter to an ALJ for a contested case hearing.[2]

"A contested case is a proceeding 'in which the legal rights, duties or privileges of a party are required by Constitution or statute to be determined by an agency after an opportunity for an evidentiary hearing.' " *Greenwood Manor v. Iowa Dep't of Pub. Health,* 641 N.W.2d 823, 834 (Iowa 2002) (quoting Iowa Code § 17A.2(5) (1999)). "The

---

[2]When the chiropractors filed their request for a contested case proceeding, Susan Voss was the Commissioner of Insurance. Iowa Official Register, 2011–2012, at 157. Her term expired April 30, 2013. *Id.* At the time of the ruling by the commissioner, Nick Gerhart was the Commissioner of Insurance. Iowa Official Register, 2015–2017, at 158.

underlying purpose of an evidentiary hearing is to adjudicate disputed facts pertaining to particular individuals in specific circumstances." *Id.*

Neither a statute nor the constitution requires the Iowa Insurance Division to provide an evidentiary hearing in matters arising from conduct governed by chapter 514F. Further, prior to the chiropractors filing their petition for a contested case hearing, there had been no agency action. However, the commissioner has the discretion to appoint an ALJ to hear contested cases arising from conduct governed by section 514F.2 and did so in this case. *See* Iowa Code § 505.29 (2013). Additionally, pursuant to rule, "[a] declaratory order has the same status and binding effect as a final order issued in a contested case proceeding," and "[i]ssuance of a declaratory order constitutes final agency action on the petition." Iowa Admin. Code r. 191—2.12.

We review agency action, whether in the form of a contested case or a declaratory order under section 17A.19(10) of the Iowa Code. Iowa Code § 17A.19(1). Thus, whether the commissioner treated this as a contested proceeding or as a declaratory order, we review the final agency action under the same analytical framework. Therefore, even though the commissioner assigned this as a contested case under section 505.29, there is no need for us to decide whether the commissioner has the authority to adjudicate a contested case between Wellmark and the chiropractors to determine this appeal.

**V. Whether Iowa Code Section 514F.2 Regulates Payments to Providers.**

The commissioner found section "514F.2 does not prohibit insurers, nonprofit service corporations, health maintenance organizations, or self-insurers for health care benefits to employees from engaging in any particular act or practice." In reaching this conclusion,

the commissioner broke section 514F.2 into two parts: the construction clause and the proviso clause.

The construction clause states,

> Nothing contained in the chapters of Title XIII, subtitle 1, of the Code shall be construed to prohibit or discourage insurers, nonprofit service corporations, health maintenance organizations, or self-insurers for health care benefits to employees from providing payments of benefits or providing care and treatment under capitated payment systems, prospective reimbursement rate systems, utilization control systems, incentive systems for the use of least restrictive and least costly levels of care, preferred provider contracts limiting choice of specific provider, or other systems, methods or organizations designed to contain costs without sacrificing care or treatment outcome,

*Id.* § 514F.2.

The proviso clause states,

> provided these systems do not limit or make optional payment or reimbursement for health care services on a basis solely related to the license under or the practices authorized by chapter 151 or on a basis that is dependent upon a method of classification, categorization, or description based upon differences in terminology used by different licensees under the chapters of Title IV, subtitle 3, of the Code in describing human ailments or their diagnosis or treatment.

*Id.* The commissioner then found the proviso clause simply qualifies the construction clause.

The district court approached the problem by referring to its "simplified version" of the statute. It stated its "simplified version" as follows:

> Nothing contained in the Insurance Chapters of the Iowa Code shall be construed to prohibit or discourage Wellmark from providing preferred provider contracts limiting choice of specific provider, *provided* the preferred provider contracts do not limit or make optional payment or reimbursement for health care services on a basis solely related to a chiropractor's license.

The district court interpreted the proviso clause of section 514F.2 to mean it only "concerns coverage availability and does not regulate provider in-network fee schedules." The district court reasoned the legislature created section 514F.2 to clarify that House File 2219 "did not prevent insurance companies from utilizing preferred provider contracts as long as the contracts did not limit coverage solely on a basis related to license." On this basis, the district court affirmed the commissioner's decision.

We disagree with both interpretations. "[W]e only engage in statutory interpretation if the terms or meaning of the statute are ambiguous." *State v. McIver*, 858 N.W.2d 699, 703 (Iowa 2015). "A statute's meaning is ambiguous if reasonable persons can disagree on its meaning." *Sierra Club Iowa Chapter v. Iowa Dep't of Transp.*, 832 N.W.2d 636, 644 (Iowa 2013). We find section 514F.2 is ambiguous, and thus, engage our canons of statutory interpretation.

> The polestar of statutory interpretation is legislative intent. To discern that intent, it is necessary to examine the whole act of which the statutory provision in question is a part. Particularly relevant are substantively related provisions adopted in the same legislative session. From this examination of related provisions, an overall legislative scheme may become evident.

*State v. Conner*, 292 N.W.2d 682, 684 (Iowa 1980) (citations omitted).

Section 514F.2 finds its genesis in House File 2219, along with Iowa Code sections 509.3, 514.7, and 514B.1. 1986 Iowa Acts ch. 1180. The district court reasoned that sections 509.3, 514.7, and 514B.1 are all "coverage provisions," and because section 514F.2 was included in House File 2219 and contains similar language, section 514F.2 only "concerns coverage availability and does not regulate provider in-network fee schedules."

Our examination of the enactment of House File 2219 leads us to reach a different conclusion. The final bill provides, in relevant part:

> Sec. 2. Section 509.3, Code 1985, is amended by adding the following new subsection:
>
> NEW SUBSECTION. 7. A provision shall be made available to *policyholders* under group policies covering diagnosis and treatment of human ailments for payment or reimbursement for necessary diagnosis or treatment provided by a chiropractor licensed under chapter 151, if the diagnosis or treatment is provided within the scope of the chiropractor's license and if the policy would pay or reimburse for the diagnosis or treatment by a person licensed under chapter 148, 150, or 150A . . . .
>
> . . . .
>
> Sec. 5. Section 514.7, Code 1985, is amended by adding the following new unnumbered paragraph:
>
> NEW UNNUMBERED PARAGRAPH. A provision shall be made available in approved contracts with hospital and medical *subscribers* under group subscriber contracts of plans covering diagnosis and treatment of human ailments, for payment or reimbursement for necessary diagnosis or treatment provided by a chiropractor licensed under chapter 151 . . . .
>
> . . . .
>
> Sec. 7. Section 514B.1, subsection 2, Code 1985, is amended by adding the following new unnumbered paragraph:
>
> NEW UNNUMBERED PARAGRAPH. The health care services available to *enrollees* under prepaid group plans covering diagnosis and treatment of human ailments, shall include a provision for payment of necessary diagnosis or treatment provided by a chiropractor licensed under chapter 151 . . . .

1986 Iowa Acts ch. 1180 (emphasis added).

These three provisions were not included in the bill as offered. H.F. 2219, 71st G.A., 2d Sess. (Iowa 1986). Numerous legislators offered

these three sections in one amendment to the original bill. Amendment 5260 to H.F. 2219, 71st G.A., 2d Sess. (Iowa 1986). The house passed this amendment. *Id.* The subject matter of this amendment concerned coverage provisions relating to chiropractic services. *Id.* In other words, this amendment related to the coverage an insurer provided its policyholders, subscribers, or enrollees. These provisions required the insurer to include chiropractic services in its plans it offered to its policyholders, subscribers, or enrollees.

The committee on commerce chair introduced a separate amendment to the original bill. Amendment S-5462 to H.F. 2219, 71st G.A., 2d Sess. (Iowa 1986). The house passed this amendment. *Id.* The amendment covered fees a chiropractor could receive for services rendered. *Id.* One subject of the amendment dealt with the peer review of the reasonableness of charges by chiropractors by peer review committees. *Id.* The code editor codified this section as section 514F.1 in the 1987 Code. Another subject the amendment covered was payment of services to chiropractors by insurers. *Id.* The code editor codified this section as section 514F.2 in the 1987 Code. This is the provision we are interpreting.

The house passed section 514F.2 independently from sections 509.3, 514.7, and 514B.1. The latter three sections are coverage sections. The purpose of those sections was to set forth the requirements between an insurer and its policyholders, subscribers, or enrollees. The purpose of section 514F.2 was to set forth the reimbursement requirements between the insurer and providers, including chiropractors. Section 514F.2 does not contain any specific language pertaining to "policyholders," "subscribers," or "enrollees," as the other three sections do.

We find, based on the legislative history, the legislature intended section 514F.2 to be distinguishable from the other three coverage provisions. We further find the legislative intent of section 514F.2 was to regulate the reimbursement an insurer is required to pay a chiropractor rather than an insurer's coverage of its insured. Therefore, we disagree with the commissioner and district court interpretations of section 514F.2.

This finding does not end our inquiry. As an alternative ground, the commissioner found that if section 514F.2 regulates the reimbursement an insurer is required to pay a chiropractor, Wellmark does not base its payments for chiropractic care solely on licensure in violation of section 514F.2. On judicial review, the district court in an "abundance of caution" found that if section 514F.2 regulates the reimbursement an insurer is required to pay a chiropractor, substantial evidence supported the commissioner's findings that Wellmark does not base its payments for chiropractic care solely on licensure in violation of section 514F.2.

**VI. Whether Wellmark Bases Payments for Chiropractic Care Solely on Licensure in Violation of Iowa Code Section 514F.2.**

The commissioner made the finding that Wellmark does not base its payments for chiropractic care solely on licensure. The district court affirmed this finding. We can only overturn the commissioner's finding of fact if the finding "is not supported by substantial evidence in the record before the court when that record is viewed as a whole." Iowa Code § 17A.19(10)(*f*). On appeal, our charge "is not to determine whether the evidence supports a different finding; rather, our task is to determine whether substantial evidence . . . supports the findings actually made." *Mike Brooks, Inc. v. House*, 843 N.W.2d 885, 889 (Iowa 2014) (quoting

*Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011)). Thus, the commissioner's findings of fact bind us if substantial evidence supports the findings.

There is no question Wellmark pays lower fees to chiropractors than it does to medical and osteopathic doctors for (1) manipulation, (2) x-rays or radiology, and (3) office visits. Although chiropractors receive a lower fee for these services, it does not necessarily follow that Wellmark is basing the lower fee *solely* on a chiropractor's licensure.

To determine its fee structure, Wellmark utilizes the American Medical Association's Current Procedural Terminology, Professional Edition, when billing for a service. This book identifies codes for each service a provider may provide to a patient. The industry refers to the codes as CPT codes. All providers and insurers in the United States use these CPT codes. The purpose of CPT codes is to provide uniformity to accurately describe the services of providers.

Wellmark reimburses providers for their services by assigning a unit fee cost for each CPT code. The unit fee cost is lower for chiropractors than medical and osteopathic doctors for three types of services: (1) manipulation, (2) x-rays or radiology, and (3) office visits. This results in a lower reimbursement for these services provided by chiropractors to Wellmark's policyholders, subscribers, or enrollees.

In determining the unit fee cost for providers, Wellmark looks to the Centers for Medicare and Medicaid Services (CMS) Relative Value Units (RVUs). The CMS publishes a list of RVUs for each specialty, considering (1) the time it takes the specialty to perform the type of procedure, (2) the specialty's technical skill to perform the type of procedure, (3) the judgment exercised by the specialty for the type of procedure, (4) the stress incurred by the specialty with regard to the type

of procedure, (5) the specialty's practice expenses to perform the type of procedure, and (6) the specialty's malpractice insurance cost.

In addition to the CMS RVUs, Wellmark factors in the number of available providers of chiropractic, its policy of keeping premiums in line with the consumer price index, the overhead costs to various providers; the amount of time spent on procedures by various providers, the additional services provided by medical or osteopathic licensed physicians, and the additional training requirements for medical or osteopathic physicians. In setting its fees, Wellmark applies multiple interrelated factors relating to our healthcare system.

Wellmark adjusts its fees to all providers on a regular basis. Some providers' reimbursements increase, while others decrease. The evidence established that from 2007/2006 through 2013/2012, seven of the thirteen medical or osteopathic specialty groups experienced decreases in at least one available pool of money, while over the same time period Wellmark did not decrease the pool of money for chiropractors. Wellmark did not base these adjustments on licensure, but on the numerous factors it uses to set its reimbursement rates for its providers.

To justify the difference in its fee schedules, Wellmark called a number of witnesses to explain how it determines its fee schedules. A licensed chiropractor testified concerning the additional medical training physicians receive before the state licenses a physician, the additional services physicians provide patients, and the additional costs physicians incur to practice, such as insurance and the assistants required to be in the office. A licensed osteopathic physician, who works in family practice and urgent care, explained his extensive training in medical school and residency, his treatment of disorders of the spine or joints, the time it takes to perform his services, and the costs of his practice. These

witnesses established medical and osteopathic doctors spend more time at a higher cost to perform the same service as a chiropractor.

For example, the evidence established chiropractors spend about half the time a physician does to perform a manipulation. Chiropractic manipulation therapy (CMT) is different from osteopathic manipulation therapy (OMT). The body regions a chiropractor performs CMT on cover five spinal regions, including the cervical, thoracic, lumbar, sacral, and pelvic, and five extraspinal regions, including the head, lower extremities, rib cage, and abdomen. The body regions a physician performs OMT on include the head, cervical, thoracic, lumbar, sacral, pelvic, lower extremities, upper extremities, rib cage, abdomen, and viscera. Further, the CMS, not Wellmark, determines the RVUs for CMT and OMT.

A chiropractor using a mechanical device to perform CMT on three levels takes an average of two to five minutes. A physician spends fifteen minutes to perform an OMT for one to two areas and fifteen to thirty minutes for five to six areas. Although both the chiropractor and the physician are performing a manipulation to an area of the body, the physician uses a different technique for a longer time than a chiropractor does.

The direct costs—which include staff costs, supply costs, and equipment costs—for a chiropractor to perform a manipulation is about $3.06, while a physician's direct costs are about $5.44. These are the types of differences influencing the reimbursement disparity between chiropractors and physicians.

Because a physician's scope of practice is broader than a chiropractor's scope of practice, a physician's overhead is more expensive than that of a chiropractor. For example, physicians usually employ registered nurses and have equipment in their offices to treat other

abnormalities not related to the spine. Further, the malpractice insurance expense is much higher for physicians than for chiropractors. These factors also influence the reimbursement levels of chiropractors and physicians.

Chiropractors usually read their own x-rays and look for anomalies of the spine. Board certified radiologists, whose training allows them to look for tumors or other medical conditions, usually read x-rays ordered by other physicians. With respect to the difference in rate for x-ray or radiology services, there was testimony that physicians who are radiologists have skill and judgment chiropractors do not possess, with additional training after the completion of medical school and national board certification. Physicians who are board certified radiologists evaluate x-rays for surgical procedures and chiropractors do not. The cost of a chiropractor reading an x-ray is less than that of a radiologist. This factor influences reimbursement levels.

Although another fact-finder may come to a different conclusion, the record made at the hearing supports the commissioner's finding that the method Wellmark uses to set fees for its providers depends on a large number of complex factors concerning the healthcare system and that Wellmark does not base its reimbursement to chiropractors based solely on a chiropractor's licensure. Because substantial evidence supports the commissioner's finding that the lower fees Wellmark pays to chiropractors is not based solely on a chiropractor's licensure, we are required to affirm the commissioner's finding.

**VII. Whether ERISA Preempts the Application of Section 514F.2 to Self-Funded Health Plans.**

The district court affirmed the commissioner's decision that ERISA preempts section 514F.2 as to Wellmark's self-funded health plans. The

chiropractors argue that ERISA does not preempt section 514F.2, because the statute addresses contractual matters between insurers and providers, and it does not pertain to health benefit plans for employees or beneficiaries at all.

"ERISA broadly preempts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' governed by ERISA." *Daley v. Marriott Int'l, Inc.*, 415 F.3d 889, 894 (8th Cir. 2005) (quoting 29 U.S.C. § 1144(a) (2000)). While ERISA does not preempt state law that regulates insurance, self-funded ERISA plans are not engaged in the business of insurance. 29 U.S.C. § 1144(b)(2)(A)–(B) (2012). Further, the Supreme Court has held that a state statute "relates to" an ERISA plan "if it [1] has a connection with or [2] references to such a plan." *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 154 F.3d 812, 819 (8th Cir. 1998) (quoting *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 129, 113 S. Ct. 580, 583 (1992)).

Section 514F.2 is "connected with" and makes a "reference to" ERISA plans. The main objective of ERISA is to provide employees with stable benefits. *Magellan Health Servs., Inc. v. Highmark Life Ins. Co.*, 755 N.W.2d 506, 513 (Iowa 2008). While section 514F.2 may not directly regulate the amount of healthcare coverage, it is connected to an ERISA plan because it could affect how much ERISA plans pay their in-network providers. *See Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 363 (6th Cir. 2000).

Accordingly, we affirm the commissioner's ruling that ERISA preempts section 514F.2 in regards to Wellmark's self-funded health plans, because the statute is connected with and references such self-funded plans.

**VIII. Summary and Disposition.**

We hold: (1) the interpretation of Iowa Code section 514F.2 has not been clearly vested by a provision of law in the discretion of the commissioner, (2) section 514F.2 regulates insurer's payments to providers, (3) Wellmark's fees for chiropractic care are not based solely on licensure, and (4) ERISA preempts the application of Iowa Code section 514F.2 to self-funded health plans. Accordingly, we affirm the judgment of the district court.

**AFFIRMED.**

Hecht and Zager, JJ., join this opinion. Cady, C.J., concurs in the result and files a special concurrence. Mansfield, J., files a separate special concurrence in which Waterman, J., joins. Appel, J., takes no part.

**CADY**, **Chief Justice (concurring specially).**

I concur in the result reached by the majority. I would not reach the issue of whether or not Iowa Code section 514F.2 (2013) regulates reimbursement of chiropractic services. Even assuming it did, the lower fees paid to chiropractors by Wellmark, Inc. would not violate the statute because substantial evidence supports the finding by the commissioner in this case that the lower fees were not based solely on licensure.

#15–1248, *Abbas v. Iowa Ins. Div.*

**MANSFIELD, Justice (concurring specially).**

I concur in the result and in all but Parts V and VI of the court's opinion.

I do not agree that Iowa Code section 514F.2 regulates *amounts paid* for chiropractic services. Rather, I believe it merely requires that healthcare plans with cost-containment features not discriminate in their *coverage* of chiropractic services.

As the majority notes, the 1986 legislation enacted four separate nondiscrimination provisions relating to chiropractic services. *See* 1986 Iowa Acts ch. 1180, §§ 2, 5, 7, 10. The first required that group health accident or health insurance plans provide coverage for chiropractic services on a nondiscriminatory basis. *See id.* § 2 (now codified at Iowa Code § 509.3(1)(*f*) (2017)). The second required nonprofit health service corporations to provide coverage for chiropractic services on a nondiscriminatory basis. *See id.* § 5 (now codified at Iowa Code § 514.7(3)). The third required health maintenance organizations (HMOs) to provide nondiscriminatory coverage for chiropractic services. *See id.* § 7 (now codified at Iowa Code § 514B.1(5)(*c*)). And the fourth, the one at issue in this litigation, related to all insurers and self-insurers, and authorizes them to use

> capitated payment systems, prospective reimbursement rate systems, utilization control systems, incentive systems for the use of least restrictive and least costly levels of care, preferred provider contracts limiting choice of specific provider, or other systems, methods or organizations designed to contain costs without sacrificing care or treatment outcome, provided these systems do not limit or make optional payment or reimbursement for health care services on a basis solely related to the license under or the practices authorized by chapter 151 or on a basis that is dependent upon a method of classification, categorization, or description based upon differences in terminology used by

> different licensees under the chapters of [Title IV, subtitle 3] of the Code in describing human ailments or their diagnosis or treatment.

*Id.* § 10 (now codified at Iowa Code § 514F.2).

The majority finds that the first three provisions merely prohibit discrimination in coverage while the fourth prohibits discrimination in rates. I think all four relate to coverage only.

The language in the quoted text of section 10 that begins with the word "provided" was added to make clear that the specific new authorization in the 1986 legislation for cost containment systems would not undermine the broad principle elsewhere in the 1986 legislation requiring coverage of chiropractic services. Without that proviso, an insurer or self-insurer might argue that a cost containment system is exempt from the mandate to cover chiropractic services.

Notably, the legislature employed the phrase, "provided these systems do not *limit or make optional* payment or reimbursement." *Id.* (emphasis added). As the appellees point out, the term "limit" is ambiguous. You can limit something either by paying less for it or by not paying for it at all. However, as they further observe, the term "make optional" is not the language of rate regulation. If something is made optional it is not covered. Thus, the proviso clarifies that chiropractic services must be covered without discrimination in any cost containment system.

Also, if the section 514F.2 proviso were intended to grant authority for rate regulation, as opposed to merely clarifying that the rest of section 514F.2 does not supersede sections 509.3(1)(*f*), 514.7(3), and 514B.1(5)(*c*) requiring coverage of chiropractic services on a nondiscriminatory basis, it would be odd to have such authority appear only in a proviso. And it would be odder still to prohibit rate

discrimination only when cost containment systems were used, but not for example in traditional fee-for-service plans.

Moreover, the identical "limit or make optional" language appears in two of the other nondiscrimination provisions in the 1986 legislation. *See id.* §§ 2, 7. Both of those are acknowledged by the majority to be coverage provisions only. Does the phrase mean two different things within the very same statute? I think not. *See State v. Paye*, 865 N.W.2d 1, 7 (Iowa 2015) ("When the same term appears multiple times in the same statute, it should have the same meaning each time.").

The court makes much of the fact that section 10 of the 1986 legislation was added as an amendment to the original bill. This strikes me as a "so what?" When the general assembly added section 10 on cost containment, at that point it also needed to add language clarifying that the newly granted authority to utilize cost containment systems would not override the requirement that insurers not discriminate in coverage of chiropractic services. Hence, the proviso was included in section 10.

For all these reasons, I would affirm both the district court's judicial review decision and the insurance division's administrative ruling on this alternative ground. Both of them concluded that the proviso in Iowa Code section 514F.2 pertained to coverage of chiropractic services only, and so do I.

Because I do not view Iowa Code section 514F.2 as authority for regulating rates, I do not need to reach Part VI of the court's opinion. However, let me briefly explain my disagreement with that part of the court's analysis. To the extent section 514F.2 prohibits discrimination, the sweep is broader than just discrimination based "solely on licensure," as urged by the court. To the contrary, section 514F.2 also prohibits discrimination based upon the "practices" that chiropractors are

authorized to perform or "a method of classification, categorization, or description based upon differences in terminology used by different licensees." Iowa Code § 514F.2.

To me, when an insurer says it pays all chiropractors categorically less than it pays other healthcare providers for performing the same procedures because chiropractors as a group have less training, a more limited scope of practice, and lower overhead and costs, this is not an out for the insurer. The insurer is *still* discriminating based on the chiropractor's status as a chiropractor (i.e., his or her licensing and practice). Wellmark does not claim, for example, that it would pay more to a chiropractor who had a Ph.D. or an ornate office.

But again, I do not believe Iowa Code section 514F.2 is a rate provision. Thus, section 514F.2 does not prohibit an insurer from paying a chiropractor less than another healthcare provider for the same procedure, so long as the insurer covers chiropractic performance of that procedure. Accordingly, Part VI of the court's opinion reaches an issue that I do not need to reach.

For the foregoing reasons, I specially concur.

Waterman, J., joins this special concurrence.