# In the Iowa Supreme Court

No. 25–0172

Submitted April 15, 2026—Filed May 15, 2026

**Kevin Koeller,**

Appellant,

vs.

**Cardinal Logistics Management Corporation** and
**Ace American Insurance Company,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, judge.

An employee seeks further review of a court of appeals decision that affirmed a district court order dismissing his petition for judicial review of a workers' compensation decision. **Decision of Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed in Part, Reversed in Part, and Case Remanded.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Joseph S. Powell of Thomas J. Reilly Law Firm, P.C., Des Moines, for appellant.

Patrick J. Mack of Gilson Daub, LLP, Bennington, Nebraska, for appellees.

**Mansfield, Justice.**

## I. Introduction.

"[T]he inquiry, then, is, what is 'law?' " *State v. Hockett*, 30 N.W. 742, 744 (Iowa 1886).

In 2017, the general assembly voted to make "the guides to the evaluation of permanent impairment, published by the American medical association," part of our law of workers' compensation. *See* 2017 Iowa Acts ch. 23, § 9 (codified at Iowa Code § 85.34(2)(*x*) (2018)). It directed that, in cases of permanent partial disability involving loss or loss of use of a scheduled member, "the extent of loss or percentage of permanent impairment shall be determined solely by utilizing [the AMA *Guides*]." *Id.* (codified at Iowa Code § 85.34(2)(*x*) (2018)).

In this case of a worker who suffered a left shoulder injury while on the job, we now are called upon to interpret that law. Unfortunately, it is not entirely clear what that law means. A divided panel of the court of appeals came to two different conclusions.

On our review, we agree with the court of appeals dissent. Accordingly, we vacate the decision of the court of appeals on this point, we affirm in part and reverse in part the order of the district court, and we remand to the district court so that this case can be remanded to the workers' compensation commission for further proceedings in accordance with this opinion.

## II. Facts and Procedural History.

**A. Kevin Koeller's Workplace Injury.** Kevin Koeller worked for Cardinal Logistics Management Corporation as a semitruck driver. Cardinal transports goods for a department store chain. Koeller's job was to deliver goods to department stores located in the Midwest. In addition to driving the truck, Koeller was responsible for unloading it at each stop.

On October 5, 2022, Koeller injured his left shoulder in the course of unloading his truck. The truck has a roll-up door. Unbeknownst to Koeller, a pallet had fallen over inside, jamming the door shut. When Koeller grabbed the handle of the door with his left hand and tried to yank it upward, the door stuck. Koeller immediately felt a popping sensation in his left shoulder. Eventually, the door had to be opened with a floor jack.

**B. Care Following the Injury.** Koeller sought medical care over the weekend because his shoulder had turned black and blue. In the ensuing days, Koeller continued to experience numbness, tingling, and pain in his left hand and arm. MRIs revealed partial tearing of tendons as well as some preexisting acromioclavicular (AC) joint degenerative disease.

Matthew Bollier, M.D., an orthopedic surgeon at the University of Iowa Hospitals and Clinics, initially recommended conservative treatment: injections and physical therapy. Neither treatment improved Koeller's shoulder pain or the persistent numbness running from his upper arm to his fingers. Eventually, Dr. Bollier diagnosed a traumatic left rotator cuff tear and recommended surgery.

On February 7, 2023, Dr. Bollier performed surgery on Koeller's left shoulder. The surgery included reattachment of the torn labrum, debridement, biceps tenotomy, subacromial decompression, and—lastly—a distal clavicle excision (i.e., removal of part of the clavicle bone).

**C. Medical Evaluations of Koeller's Permanent Disability.** Following the surgery, Koeller's pain and range of motion improved, but he continued to experience numbness and tingling in his left arm and fingers. Still, a needle electromyography (EMG) on April 20 returned normal findings on all ten tested muscles in the left shoulder, arm, and hand. Dr. Bollier placed Koeller at

maximum medical improvement for his left shoulder injury and indicated that he could return to work without restrictions. He assigned Koeller 6% permanent impairment to the left upper extremity for loss of range of motion. He did not assign any impairment for the distal clavicle excision because he felt the need for it "was not caused by the work injury."

Koeller's attorney arranged for an independent medical exam (IME) with Mark Taylor, M.D. Dr. Taylor is board-certified in occupational medicine. Following a record review and a physical examination of Koeller, Dr. Taylor assigned a 9% permanent impairment to the left upper extremity based on loss of range of motion. And he assigned an additional 1% for weakness of supination in the forearm. Separately, he assigned 10% permanent impairment to the left upper extremity for the distal clavicle excision. Dr. Taylor explained that he attributed the distal clavicle excision to Koeller's October 5, 2022 work injury because "[b]ut for the work injury, Mr. Koeller would not have required a distal clavicle excision at the time that he did. . . . Prior to the injury, he was not experiencing pain over the left shoulder or over the AC joint."

Dr. Taylor explained that the 10% figure came from Table 16-27 in American Medical Association, *Guides to the Evaluation of Permanent Impairment* § 16.7b tbl.16-27, at 506 (Linda Cocciarella & Gunnar B. J. Andersson eds., 5th ed. 2001) [hereinafter AMA *Guides*]. That table addresses impairment of the upper extremity after certain arthroplasties, including a distal clavicle excision. *Id.*[1] Dr. Taylor did not apply the 25% multiplier from Table 16-18 to translate a

---

[1]Table 16-27 technically refers to a "resection." AMA *Guides* § 16.7b, at 505–06. Dr. Bollier and Dr. Taylor described the procedure performed on Koeller as an "excision." The third physician who provided an opinion, Dr. Brian Crites, characterized the procedure as a resection. Although an Iowa treatise indicates that "[t]he excision procedure is less invasive than the resection procedure," 15 John Lawyer & James R. Lawyer, *Iowa Practice Series: Workers' Compensation* § 13:5, at 164 (2025–2026 ed. 2025), no one in this case appears to have drawn

percentage of AC joint impairment to a percentage of upper extremity impairment. *See id.* § 16.7 tbl.16-18, at 499. As he interpreted the AMA *Guides*, Table 16-18 did not apply to the values in Table 16-27.[2]

Overall, Dr. Taylor concluded that Koeller had suffered a 19% permanent impairment of the left upper extremity due to his work injury. He derived that number by adding together the 9% figure for loss of motion and the 10% figure for the distal clavicle excision. He applied the combined value chart in the AMA *Guides* to reduce that number from 19% to 18%, but then added back 1% for the forearm weakness, bringing the final number to 19% permanent impairment of the left upper extremity.

Another orthopedic surgeon—Brian Crites, M.D.—offered a third opinion, although he performed only a record review. He agreed with Dr. Taylor that the October 5, 2022 work injury had created the need for the distal clavicle excision. His overall percentage for permanent impairment was similar to Dr. Taylor's, although his methodology differed somewhat.

**D. Proceedings Before the Workers' Compensation Commission.** The arbitration hearing took place on November 15, 2023. The deputy commissioner found Dr. Taylor's medical opinions to be more credible than the others and adopted them. However, the deputy concluded that Dr. Taylor had interpreted the AMA *Guides* erroneously. Specifically, the AMA *Guides* instruct that with disorders including resection arthroplasty, "[t]he severity of the impairment due to these disorders is rated separately according to Tables 16-19 through 16-30 and then multiplied by the relative maximum value of the unit involved as

_____

a distinction between the two terms. The deputy used the terms interchangeably in her decision that was adopted by the commissioner.

[2]Dr. Taylor explained the reasons for his interpretation in his report.

specified in Table 16-18." *Id.* § 16.7, at 498. Based on this language, the deputy found that the 10% impairment for the distal clavicle excision from Table 16-27 had to be multiplied by the 25% figure in Table 16-18. *See id.* § 16.7, at 499, 506. That meant that Koeller had suffered a 2.5% impairment of the upper left extremity from the excision, which the deputy rounded up to 3%. Adding in the remaining 10% impairment for loss of motion and weakness resulted in a 13% overall impairment of the upper left extremity, rather than 19%.

The deputy also resolved other issues disputed by the parties. Those included Koeller's underlying weekly rate, whether Koeller was entitled to penalty benefits, Koeller's request for reimbursement of certain medical bills, the appropriate fee for the IME, and whether Koeller had a claim for alternate medical care to see a brachial plexus specialist for his numbness and tingling.

Each party appealed to the commissioner, who upheld the deputy's ruling with one minor change.

**E. District Court Proceedings.** Both Koeller and Cardinal then petitioned for judicial review. The district court dismissed both petitions and affirmed the commissioner's decision.

In its ruling, the district court rejected Cardinal's argument that the commissioner should have followed Dr. Bollier's medical opinions. Yet, the court was not persuaded by Koeller's argument that Iowa Code section 85.34(2)(*x*) (2024) required the commissioner to adopt Dr. Taylor's entire opinion, including his interpretation of the AMA *Guides*.

Koeller attempted to convince the district court that the commissioner had exceeded his authority when he applied the 25% modifier in Table 16-18 to the distal clavicle excision referenced in Table 17-27, since no expert in the case had

actually advocated for that approach.[3] But the district court concluded otherwise:

> It is true that expert opinions play a fundamental role in workers' compensation law, but their influence is not unlimited. An expert cannot opine their way out of the plain language of the AMA Guides, adopted in both statute and regulation, which specifically state that resections in the upper extremity are subject to a 25% multiplier. It requires no lay testimony or agency expertise to reach this conclusion. Here the Commissioner was faced with a quandary, because none of the expert opinions provided accounted for the DCE *and* correctly applied the AMA Guides. The best option available was to make a small correction relying on the plain language of the AMA Guides. To do otherwise would contradict precedent and the plain meaning of the statute.

The district court also overruled the parties' remaining challenges to the commissioner's decision, including its ruling on alternate medical care.

**F. Proceedings in the Court of Appeals.** Each side appealed the district court's ruling, and we transferred the case to the court of appeals.

In a split decision, the court of appeals affirmed the district court. The court of appeals majority agreed with the district court that substantial evidence supported the commissioner's adoption of Dr. Taylor's *medical* opinions, and that section 85.34(2)(*x*) did not require the commissioner to accept Dr. Taylor's *legal* interpretation of the AMA *Guides*. The majority also affirmed the granting of Koeller's request for alternate medical care.

One member of the panel dissented in part. He concurred in the majority's determination that Dr. Taylor's medical opinions constituted substantial evidence and in the majority's ruling on alternative medical care. He also agreed that determinations of the percentage of permanent impairment had to be based

---

[3]Dr. Bollier, as noted, had excluded the distal clavicle excision from his permanent disability calculation altogether. He felt it was not related to Koeller's October 5, 2022 work injury.

on expert testimony and the AMA *Guides*, but that the agency and the courts were not bound by expert interpretations of particular language in the AMA *Guides*. Nonetheless, as he read the AMA *Guides*, Dr. Taylor was correct in determining that the 25% modifier in Table 16-18 did *not* apply to a distal clavicle excision as referenced in Table 16-27. Thus, the dissent would have sustained Koeller's appeal on this point and sent the case back to the commission for further proceedings.

We granted Koeller's application for further review.

### III. Standard of Review.

"In reviewing an agency decision on judicial review, we will apply the standards of chapter 17A to determine if we reach the same results as the district court." *StateLine Coop. v. Iowa Prop. Assessment Appeal Bd.*, 958 N.W.2d 807, 812 (Iowa 2021) (quoting *Naumann v. Iowa Prop. Assessment Appeal Bd.*, 791 N.W.2d 258, 260 (Iowa 2010)). We accept the commissioner's factual findings when supported by substantial evidence. *See* Iowa Code § 17A.19(10)(*f*) (permitting courts to grant relief when an agency action is "[b]ased upon a determination of fact . . . that is not supported by substantial evidence").

"When this court grants an application for further review, we retain discretion to review all the issues raised on appeal or in the application for further review, or only a portion thereof." *JBS Swift & Co. v. Ochoa*, 888 N.W.2d 887, 892 (Iowa 2016) (quoting *Ramirez–Trujillo v. Quality Egg, L.L.C.*, 878 N.W.2d 759, 768 (Iowa 2016)). Here we elect to allow the court of appeals decision to stand as the final decision on alternate medical care. *See id.* We thus review only the determination of permanent partial disability benefits.

**IV. Legal Analysis.**

Both sides agree that Koeller suffered some degree of permanent partial disability due to his October 5, 2022 left shoulder injury. The question is how much.[4]

**A. The Legal Framework.** Iowa Code section 85.34(2) addresses the determination of permanent partial disability. It provides,

> Compensation for permanent partial disability shall begin when it is medically indicated that maximum medical improvement from the injury has been reached and that the extent of loss or percentage of permanent impairment can be determined by use of the guides to the evaluation of permanent impairment, published by the American medical association, as adopted by the workers' compensation commissioner by rule pursuant to chapter 17A.

The commissioner has by rule adopted the fifth edition of the AMA *Guides* "for determining the extent of loss or percentage of impairment for permanent partial disabilities and payment of weekly compensation for permanent partial scheduled injuries under Iowa Code section 85.34(2) not involving a determination of reduction in an employee's earning capacity." Iowa Admin. Code r. 876—2.4.

Additionally, Iowa Code section 85.34(2)(*x*) requires the use of the AMA *Guides* for scheduled injuries such as, here, the loss of use of a shoulder:

> In all cases of permanent partial disability described in paragraphs *"a"* through *"u"*, or paragraph *"v"* when determining functional disability and not loss of earning capacity, the extent of loss or percentage of permanent impairment shall be determined solely by utilizing the guides to the evaluation of permanent impairment, published by the American medical association, as adopted by the workers' compensation commissioner by rule pursuant to chapter 17A. Lay testimony or agency expertise shall not be utilized in

---

[4]The parties have stipulated that the workplace injury for which Koeller was evaluated by Dr. Bollier, Dr. Taylor, and Dr. Crites was a scheduled shoulder injury. *See* Iowa Code § 85.34(2)(*n*); *see also Chavez v. MS Tech. LLC*, 972 N.W.2d 662, 666–70 (Iowa 2022) (discussing the meaning of "shoulder" as used in section 85.34(2)(*n*)).

determining loss or percentage of permanent impairment pursuant to paragraphs *"a"* through *"u"*, or paragraph *"v"* when determining functional disability and not loss of earning capacity.

Notably, section 85.34(2)(*x*) contains two distinct directives. First, it requires that the AMA *Guides* be used in determining the percentage of permanent impairment. *Id.* In effect, those guides are given the force of law.

Second, section 85.34(2)(*x*) prohibits the use of lay testimony or agency expertise in determining percentage of permanent impairment. *Id.* This directive may have been clearer to those who wrote it than it is to us. However, at a minimum it seems apparent that lay testimony—such as that of an injured worker—cannot be used to boost a rating above the highest rating given by expert testimony (assuming the expert has followed the AMA *Guides*). Likewise, lay testimony—such as surveillance—cannot be used to lower a rating below the lowest rate given by expert testimony (again assuming the expert has followed the AMA *Guides*).

What about the prohibition on using agency expertise? Presumably, the commissioner is supposed to be more than a cipher. After all, we often refer to the commissioner's expertise in our opinions. *See P.M. Lattner Mfg. Co. v. Rife*, 2 N.W.3d 859, 866 (Iowa 2024) ("Distinguishing marginal increases in functional impairment caused by different injuries is a factual inquiry well within the agency's expertise."). Hence, we do not read section 85.34(2)(*x*) as prohibiting the commissioner from choosing *among* expert views on a specific point. Doing so is often necessary to decide a case. But the commissioner should not supplant the role of the experts.

Also, and this is important for the present case, we do not read section 85.34(2)(*x*) as prohibiting the commissioner—or courts—from reviewing expert *interpretations* of the AMA *Guides*. After all, the AMA *Guides* have the force of

law, and what the law requires is ultimately for the agency and the courts to decide.

**B. Applying That Framework Here.** Cardinal argues that the commissioner should have accepted Dr. Bollier's evaluation of Koeller's permanent partial disability. It notes that Dr. Bollier was the treating physician, that he performed Koeller's shoulder surgery, and that only he had the opportunity to evaluate Koeller's injury intraoperatively. According to Cardinal, Dr. Bollier was "in the best position to address causation relating to [Koeller's] distal clavicle."

But generally we do not second-guess the commissioner's determinations as to which expert testimony to credit. " '[M]edical causation "is essentially within the domain of expert testimony" ' and '[u]ltimately, . . . the determination of whether to accept or reject an expert opinion is within the "peculiar province" of the commissioner.' " *Bridgestone Ams., Inc. v. Anderson*, 4 N.W.3d 676, 681 (Iowa 2024) (second alteration and omission in original) (quoting *Cedar Rapids Cmty. Sch. Dist. v. Pease*, 807 N.W.2d 839, 845 (Iowa 2011)). Dr. Taylor's expert opinion "provided substantial evidence to support the commissioner's finding" that Koeller's distal clavicle excision stemmed from his employment. *Id.*; *see also* Iowa Code § 17A.19(10)(*f*). We are not persuaded by Cardinal's contention.

We now turn to whether the commissioner acted appropriately in adjusting Dr. Taylor's rating downward from 19% impairment of the upper left extremity to 13%. For the reasons we have already stated, we conclude that the commissioner had the authority under Iowa Code section 85.34(2)(*x*) to reconsider Dr. Taylor's view of what the AMA *Guides* require. In doing so, the commissioner applied his interpretation of the governing *law*—the AMA *Guides*— to Dr. Taylor's *factual* determinations. In other words, the commissioner

accepted Dr. Taylor's medical opinions on the extent to which Koeller had lost functionality as a result of the October 5, 2022 injury. He just read the AMA *Guides* differently.

The next question, though, is whose interpretation of the AMA *Guides* was correct. In answering this question, we must consider whether their interpretation has been vested in the commissioner. Iowa Code section 17A.19(10)(*c*) empowers the reviewing court to set aside agency action "[b]ased upon an erroneous interpretation of a provision of law whose interpretation has not clearly been vested by a provision of law in the discretion of the agency." On the other hand, Iowa Code section 17A.19(10)(*l*) provides that where interpretation "has clearly been vested by a provision of law in the discretion of the agency," we defer to the agency's interpretation unless it is "irrational, illogical, or wholly unjustifiable."

"We have concluded that the legislature did not vest the workers' compensation commissioner with interpretive authority over chapter 85 generally." *Bridgestone Ams., Inc.,* 4 N.W.3d at 682; *see also Evenson v. Winnebago Indus., Inc.,* 881 N.W.2d 360, 366 (Iowa 2016) ("We have declined to give deference to the commissioner's interpretation of various provisions included in chapter 85.").

However, in reviewing agency action, we will defer to agency interpretations of technical terms within the specialized expertise of that agency. *See, e.g., Summit Carbon Sols., LLC v. Kasischke,* 14 N.W.3d 119, 133 (Iowa 2024) (deferring to the Iowa Utilities Commission's interpretation of "liquified carbon dioxide"); *cf. Den Hartog Indus. v. Dungan,* 26 N.W.3d 377, 381 (Iowa 2025) ("We do not believe the terms of the workers' compensation statute at issue here are 'uniquely within the subject matter expertise of the agency.' "

(quoting *JBS Swift & Co.*, 888 N.W.2d at 893)); *Bridgestone Ams., Inc.*, 4 N.W.3d at 682 (reviewing the commissioner's interpretation for errors at law after noting that "this case does not involve the interpretation of terms uniquely within the subject matter expertise of the agency").

Here, though, we are not being asked to unravel the meaning of technical language. Instead, our task is to resolve an ambiguity created by a seeming contradiction in the AMA *Guides*. This requires the usual interpretative tools that judges normally apply. Therefore, we conclude that 17A.19(10)(*c*) governs and we will simply decide whether the commissioner's interpretation of the AMA *Guides* was correct or not.

The opening paragraph of section 16.7 of the AMA *Guides* states,

> Conditions not previously described that can contribute to impairments of the hand and upper extremity include bone and joint disorders (Section 16.7a), presence of resection or implant arthroplasty (Section 16.7b), musculotendinous disorders (Section 16.7c), and tendinitis (Section 16.7d), and loss of strength (Section 16.8). The severity of impairment due to these disorders is rated separately according to Tables 16-19 through 16-30 and then multiplied by the maximum value of the unit involved as specified in Table 16-18. Appropriate impairment percents are combined with other impairment percents by means of the Combined Values Chart (p. 604).

AMA *Guides* § 16.7, at 498.

Distal clavicle resection is an arthroplasty covered in section 16.7b. *Id.* § 16.7b, at 505–06. The commissioner accepted Dr. Taylor's opinion that Koeller's distal clavicle excision or resection was due to his work injury. Table 16-27—the table for section 16.7b—provides that such a resection corresponds to a 10% impairment of the upper extremity. *Id.* § 16.7b tbl.16-27, at 506. Table 16-18, in turn, gives a maximum impairment value of 25% of the upper extremity for disorders of the AC joint. *Id.* § 16.7 tbl.16-18, at 499. So the commissioner

multiplied .10 by .25, resulting in a 2.5% or 3% impairment of the left upper extremity attributable to the left clavicle excision.

The commissioner's approach seems clear and logical, until one reads on. All the other tables in section 16.7 dealing with joint impairment—i.e., Tables 16-19, 16-22, 16-23, and 16-24—have individualized footnotes that state, "Multiply by the relative value of the joint (Table 16-18) to determine the . . . impairment." *Id.* § 16.7a tbls.16-19, 16-22, 16-23 & 16-24, at 500–02. Table 16-27 does not. *Id.* § 16.7b tbl.16-27, at 506.

Additionally, Tables 16-19, 16-22, 16-23, and 16-24 yield a percentage of "Joint Impairment," which logically needs to be converted to a percentage of upper extremity impairment using Table 16-18. *Id.* at § 16.7a tbls.16-19, 16-22, 16-23 & 16-24, at 500–02. Table 16-27, on the other hand, gives a percentage of "Impairment of the Upper Extremity," as if the conversion has already been made. *Id.* § 16.7b tbl.16-27, at 506.

Finally, the AMA *Guides* give examples and illustrations on how to apply Tables 16-20, 16-21, 16-23, *and* 16-27. *Id.* § 16.7a–b, at 500–02, 506. With the examples and illustrations for Tables 16-20, 16-21, 16-23, and 16-24, the Table 16-18 multiplier is used. *Id.* § 16.7a, at 500–02. With the Table 16-27 example, it isn't. *Id.* § 16.7b, at 506.

Statutory interpretation isn't an exact science, and we need to acknowledge that both sides of this debate have some merit. The opening paragraph of section 16.7 is definitive in stating that Table 16-18 applies to arthroplasties covered by section 16.7b. *Id.* § 16.7, at 498. But working through the specifics of section 16.7b, that table isn't actually applied. *Id.* § 16.7b, at 506. We agree with the court of appeals dissent that this is a situation governed by Iowa Code section 4.7:

> If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision.

The specifics in section 16.7b of the AMA *Guides* prevail over the general statement in section 16.7.

The commissioner cites to his decision in *Jay v. Archer Skid Loader Service, LLC*, Iowa Workers' Comp. Comm'n No. 19003586.01, 2022 WL 17078713 (Aug. 23, 2022), where he previously held that the 25% multiplier in Table 16-18 applies to a distal clavicle excision. *Id.* at *7. But that decision simply quotes the same paragraph from section 16.7 of the AMA *Guides* that we quoted above. *See id.* It doesn't address, let alone analyze or explain, the other passages in the AMA *Guides* that have led us to the opposite conclusion.

For the foregoing reasons, we conclude that the commissioner erred in interpreting the AMA *Guides* as requiring the use of a Table 16-18 multiplier for a distal clavicle excision. The AMA *Guides* provide that the values in Table 16-27 for upper extremity impairment are not subject to such a multiplier.

**V. Conclusion.**

For the foregoing reasons, we affirm in part and vacate in part the decision of the court of appeals. Likewise, we affirm in part and reverse in part the judgment of the district court. Finally, we remand this case to the district court so that it may in turn remand it to the commissioner for further proceedings in accordance with this opinion.

**Decision of Court of Appeals Affirmed in Part and Vacated in Part; District Court Judgment Affirmed in Part, Reversed in Part, and Case Remanded.**